**358 A.2d 1.**

# New England Telephone and Telegraph Company *vs.* Public Utilities Commission *et al.*

## MAY 20, 1976.

Present: Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

358

PAOLINO, J. On August 30, 1974, the New England Telephone and Telegraph Company (the company) filed a revised telephone tariff with the Public Utilities Commission (the commission) under authority of G. L. 1956 (1969 Reenactment) §39-3-11, as amended by P. L. 1969, ch. 240, §5. By the proposed revised tariff the company sought to change the Rhode Island intrastate telephone rates in a manner which would increase its annual revenue by approximately $19.5 million. The revised tariff was proposed to become effective September 29, 1974; howver, the effective date of the proposed tariff was suspended for the full 9 months permitted by §39-3-11, as amended, by the commission's orders dated September 26, 1974, and March 28, 1975.

Hearings before the commission commenced on November 18, 1974. The company supported the proposed tariff through testimony and exhibits presented in evidence by 11 witnesses. The Rhode Island Consumers' Council (the council) appeared in opposition to the proposed change. It presented one witness in support of its position. The

Public Utilities Administrator retained an expert on the cost of capital.

In its decision, which was announced on June 27, 1975, the commission made the following findings of fact:

"1. The annual revenues presently being received by the Company from the application of its existing rate schedules are insufficient to adequately maintain its credit and enable it to attract additional capital necessary to assure continued and adequate service and provide for needed expansion;

"2. The additional annual revenue in the amount of $19,500,000 proposed by the Company through the application of rate schedules filed August 30, 1974, is excessive; and, therefore, unjust and unreasonable;

"3. A rate base in the amount of $184.559,000 represents a fair and sound basis for rate-making purposes;

"4. A fair rate of return on that rate base, taking into consideration levels of service and efficiency of operation, is 9.02 per cent, which includes an allowance for earnings erosion of .03 per cent. Such rate of return will achieve the minimum profit margin to maintain the Company's credit and financial integrity and will enable it to raise new capital at reasonable rates to meet its service requirements;

"5. The Company is entitled to revise its existing rates and charges in a manner which will produce additional revenue in the approximate amount of $7,245,000 annually."

On the basis of these findings the commission entered an order denying the company's filing and authorizing it to file a revised tariff to produce additional annual revenue of $7,245,000. The revised filing was approved on July 18, 1975, and became effective July 21, 1975.

On July 3, 1975, the company, acting under authority of §39-5-1, as amended, commenced certiorari proceedings in this court to test the legality and reasonableness of the

commission's decision and order.[1] It moved for a special assignment and a stay of the commission's order. The company also asked that it be permitted to proceed under its proposed rate schedule and stated that if we would grant this request, it would maintain its accounting records in such form as to comply with any final order that might be entered, in the event that it might be determined the company is not entitled to the increase it has collected.

We issued the writ and by order dated July 14, 1975, denied the motion for a stay, assigned the case for hearing to the October 1975 calendar, and directed counsel to brief and argue the following question: "* * * assuming the Commission erred, can this court direct the filing of a new rate schedule which will permit the company to recover the funds it would have received if the Commission's original order had enabled the company to earn a fair and reasonable rate of return on the investment the company employs in providing intrastate telephone service." *New England Tel. & Tel. Co.* v. *Public Util. Comm'n,* 115 R. I. 909-10, 341 A.2d 59 (1975).

The company has briefed and argued as its claims of error three main points. For convenience we shall, as far as practical, treat the issues raised by the company in like manner. Before doing so, however, we shall refer briefly to the company's preliminary statement and to the controlling law in public utility cases.

### Preliminary Statement

The company argues that this case is before us now because two prior opinions of this court, namely, *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 302 A.2d 757 (1973), and *Rhode Island Consumers' Council* v. *Smith,* 113 R. I. 232, 319 A.2d 643 (1974), have failed

[1] *See Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 275 n. 1, 302 A.2d 757, 761 n. 1 (1973).

to convince the commission that the company is entitled to a *realistic* opportunity to earn a fair rate of return. Specifically, the company argues that the commission ignored this court's earlier determinations by (1) disallowing portions of its rate base which represent purchases from its affiliate, Western Electric Company, (2) rejecting the company's "going basis" adjustment for wage and salary increases based on an arbitrary productivity absorption theory, and (3) reducing the company's working capital requirements based on a basic misunderstanding of the company's lag study. Further, the company argues that the commission persisted in interpreting the evidence and indulging every inference against the company, regardless of the state of the record. The company claims that this indulging philosophy is best illustrated by (1) the commission's unwarranted rejection of the company's erosion adjustment and adoption of one without any evidentiary support; (2) its slavish acceptance of the totally inadequate return on equity proposed by its own witness; (3) its unfounded criticism of the company's construction program; and (4) its arbitrary selection of a "rule of thumb" as to the company's working capital requirements.

Finally, the company contends that the effect of the commission's approach is to make it impossible for the company to attain even the inadequate rate of return found necessary by the commission and the result is continuing confiscation of the company's and its investors' property.

## The Applicable Legal Principles

The controlling guidelines in passing upon the legality and reasonableness of the commission's report and order are summarized in our recent opinion in *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 277-78, 302 A.2d 757, 762-63 (1973), as follows. We do not engage in factfinding. That is the commission's role; ours is to de-

termine whether the commission's decision and order are lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence and sufficiently specific to enable us to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached. We pointed out that this did not mean that the necessary factual determinations must be set out in precise or specific language or that they may not be fairly and reasonably implied from the commission's language and actions. We did say, however, that if it becomes impossible for us properly to fulfill our assigned function because of the commission's failure to set forth sufficiently the findings and the evidentiary facts upon which it rests its decisions, or the reasons or true bases for its conclusions, we will not speculate thereon nor search the record for supporting evidence or reasons. Neither will we decide for ourselves what is proper in the circumstances. Instead we will remand the case in order to afford the commission an opportunity to fulfill its obligations in a supplementary or additional decision.

The following legal principles also apply to public utility rate cases. A utility "* * * is entitled to reasonable earnings which with prudent management will be adequate to maintain its credit and to attract necessary capital in addition to earnings sufficient merely to operate and maintain its existing plant." *New England Tel. & Tel. Co.* v. *Kennelly,* 81 R. I. 1, 7, 98 A.2d 835, 838 (1953); *Bluefield Water Works & Improvement Co.* v. *Public Serv. Comm'n,* 262 U. S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). This does not mean that the utility is guaranteed a fair return, but it does mean that a utility is entitled to the opportunity to achieve a fair return from the utility services it provided to the public. *Federal Power Comm'n* v. *Natural Gas Pipeline Co.,* 315 U. S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037, 1052 (1942). Reference is made also

to *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 293, 302 A.2d 757, 770 (1973), where, in discussing the criteria for determining whether a utility's rate of return is just and reasonable, this court said:

> "While those criteria do not entitle a public utility to claim the kind of benefits that may be realized in a highly profitable enterprise or in a speculative venture, they do permit an opportunity to earn a return on the value of the property employed for the public convenience equal to the returns generally achieved at the same time and in the same general part of the country on investments in other enterprises having corresponding risks and uncertainties. That return, moreover, should be sufficient to permit the utility '* * * to maintain financial integrity, attract necessary capital, and fairly compensate [its] investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable.' *Permain Basin Area Rate Cases,* 390 U. S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312, 350 (1968)."

In applying these principles, the commission must not ignore the fact that rates are made for the future. *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 292, 302 A.2d 757, 770 (1973); *Rhode Island Consumers' Council* v. *Smith,* 113 R. I. 232, 246, 319 A.2d 643, 651 (1974).

Finally, whatever formula is used by the commission in determining the rates to which a utility may be entitled, the commission's decision must, in its end result, conform to the foregoing principles. It is the end result that counts. *Narragansett Elec. Co.* v. *Kennelly,* 88 R. I. 56, 71, 143 A.2d 709, 718 (1958); *FPC* v. *Hope Natural Gas Co.,* 320 U. S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345 (1944).

With these general principles in mind, we proceed to consider the specific questions raised by the company in challenging the commission's report and order of June 27, 1975.

## A.

The company's first main point is that the commission's decision patently fails to provide it an opportunity to earn a fair return on its investment used in providing intrastate telephone service in Rhode Island.

The company argues that the commission, in its report and order, has persisted in ignoring the basic principle of ratemaking that rates be set for the future; that after two decisions[2] by this court on the company's rate filing of April 16, 1971, docketed by the commission as No. 1092, and over two years after the original filing, the company finally was permitted to put into effect in full the rates as originally filed; and that at the hearing before the commission in the instant proceeding, there was uncontradicted testimony that the rate increase finally permitted after the decisions by this court was insufficient at any time to enable the company to come close on a twelve-months-ending basis to achieving the rate of return then fixed by the commission as fair.

The company argues further that the record is absolutely clear that the effect of a continually growing investment and inflation has been to erode the company's return from its Rhode Island intrastate telephone operations; that it is also clear from the record that for the foreseeable future there will continue to be a high rate of growth of investment at a time when the company has been experiencing a negative growth; and that this imbalance among the rates of growth of investments, revenues, and expenses must necessarily produce erosion in the company's rate of return.

(1) The Commission's Erosion Adjustment

Under point A(1) the company argues that the com-

---

[2]*Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 302 A.2d 757 (1973); *Rhode Island Consumers' Council* v. *Smith,* 113 R. I. 232, 319 A.2d 643 (1974).

mission's erosion adjustment is both without support in the record and inadequate to offset the erosion which the record clearly demonstrates the company has and will continue to experience in its earnings.

The company proposed an erosion adjustment based on its average annual increased investment as a suitable adjustment to reflect erosive trends in the company's rate of return.[3] The company states that the uncontradicted evidence showed that it had a negative growth in earnings in each of the years 1972, 1973 and for the 12 months ended June 30, 1974, while maintaining a continuing growth in intrastate investment to meet the present and future needs of its customers; that the company's evidence showed an accelerating decline in earnings from operations; and that this resulted from a growth in expenses at a faster rate than true revenue growth which had been unable to match the growth in investment during the same period.

Further, the company claims that the evidence also demonstrated that its decreased operational earnings and increased investment had produced a continuing erosion in the company's rate of return over the prior 4-year period; that from February 1970 to June 1974 the company was unable, for any consecutive 12-month period, to attain the authorized return on intrastate investment; and that these figures were fully set forth by the company's general accounting manager in this state, and included the following rates of return in 1972, 1973, and 1974 after relief was afforded in Docket No. 1092:[4]

---

[3] The company's erosion adjustment would have resulted in a $1,332,000 contribution to earnings.

[4] The company also referred to the rates of return in 1970, 1971, and 1972 following the commission's prior decision in Docket No. 1024, which rates also failed to attain the authorized rate of return.

## Intrastate Returns

### Average Net Investment on Twelve Months Ended Periods

| Docket 1092 Effective May 25, 1972 Rate of Return Allowed: 8.38% | | | | Docket 1092 Remand Effective Aug. 13, 1973 Rate of Return Allowed: 8.38% | | | |
|---|---|---|---|---|---|---|---|
| 1972 | | 1973 | | 1973 | | 1974 | |
| May | 5.51% | Jan. | 6.61% | Aug. | 7.02% | Jan. | 6.80% |
| June | 5.69 | Feb. | 6.87 | Sept. | 7.03 | Feb. | 6.84 |
| July | 5.84 | March | 6.99 | Oct. | 6.91 | March | 6.90 |
| Aug. | 5.95 | April | 7.06 | Nov. | 6.92 | April | 6.92 |
| Sept. | 6.11 | May | 7.08 | Dec. | 6.83 | May | 6.96 |
| Oct. | 6.27 | June | 7.04 | | | June | 6.98 |
| Nov. | 6.42 | July | 6.99 | | | | |
| Dec. | 6.46 | | | | | | |

As previously stated, the company proposed that the commission make allowance for the erosion in rate of return which, from the basis of past experience, could be expected to continue by utilizing a projection of the historical growth in average net investment which would exist in June 1975. Robert G. Towers, an accounting witness presented by the Rhode Island Consumers' Council, had testified that there was no basis for assuming that the company's net investment would increase in the manner predicted. The company argues that, quite to the contrary, the evidence before the commission clearly showed that the company's estimate of an increase of $12,808,000 in average net investment over the 12-month period following June 30, 1974, was understated; that the average intrastate net investment of the company for the period ending June 30, 1974, was $199,714,750; that within four months, by October 30, 1974, average intrastate net investment had increased $5,357,833 to $205,072,583; and that the end-of-period net investment had reached $212,146,166.

In its decision rejecting the company's proposal, after noting its disapproval of erosion allowance as a principle of ratemaking, the commission acknowledged that it was

not unmindful of this court's admonition in *Rhode Island Consumers' Council* v. *Smith,* 113 R. I. 232, 247, 319 A.2d 643, 651 (1974), that "* * * the commission recognize erosive trends in determining the relief to be allowed the company * * *." The commission said it was also mindful, however, that this court had given it discretion in the selection of a method for compensating for erosion. *Id.*

Then, after further discussion of the company's proposal, of witness Towers' criticism of the methodology used by the company to account for erosion, and of the various ways the problem of earnings erosion has been dealt with by rate regulation, the commission said it believes that earnings erosion must be analyzed in the context of the individual rate proceedings; that the commission has discretion in determining, in light of all the facts and circumstances of an individual rate proceeding, the most appropriate method of dealing with this problem; that it had thoroughly analyzed the company's proposal, a proposal that it recognized was adopted by it in Docket No. 1092; but that upon a careful evaluation of the entire record, it concluded that the company's adjustment was too conjectural and speculative to warrant its adoption in this proceeding.

Further, the commission said that although it found the company's proposal to alleviate the problem of earnings erosion unconvincing, it recognized that the company had suffered an attrition in its earnings and reluctantly felt constrained by this court's decisions to recognize this erosive trend.

In deciding on which method it should use in making an adjustment for earnings erosion it found to exist in the case at bar, the commission referred to a recent decision by the New York Public Service Commission which, after considering various approaches to earnings erosion adjustments, decided to use an established procedure of adding

an additional return factor to the overall rate of return in order to account for anticipated erosion of earnings. *See Re Orange & Rockland Util., Inc.,* 98 P.U.R.3d 335, 348-49 (N.Y.P.S.C., 1973).

The commission felt that this procedure had merit for use in this case and, accordingly, concluded that the company's revenue requirement be calculated by adding a factor of 0.3 percent to the 8.72 percent rate of return found reasonable in this proceeding. Thus, while maintaining that there is no adequate method for forecasting what future erosion might be, the commission concluded that if an erosion adjustment must be made, the 0.3 percent additional return factor is sufficient to give the company an opportunity to earn the 8.72 percent rate of return necessary in this case. This adjustment, the commission said, would increase allowable earned revenues by approximately $553,000, a figure which in view of the evidence on the record as a whole is reasonable to compensate for any erosion of earnings in the foreseeable future.

The company contends that its proposal for earnings erosion adjustment was based on substantial uncontradicted evidence and, therefore, the commission's rejection of its proposal was error; that the commission's action in rejecting the company's erosion adjustment computation as "too conjectural and speculative" is without support in the record; that there was absolutely no evidence in the record before the commission to support its adjustment and, in fact, no evidence was submitted by anyone, except the company, on the question of an appropriate erosion adjustment; and that in arbitrarily selecting a factor of 0.3 percent the commission had once again chosen to "roam the unfenced fields of speculation." *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 285, 302 A.2d 757, 767 (1973).

Further, the company argues that the commission misinterpreted our direction by stating that "* * * our Supreme Court has given the Commission discretion in the selection of a method for compensating for erosion." It is the company's position that in *Rhode Island Consumers' Council v. Smith,* 113 R. I. 232, 247, 319 A.2d 643, 651 (1974), this court did state that the commission has discretion in the selection of a method of compensating for erosion, but the company points out that in that case evidence had been presented as to alternative methods. However, the company argues that, in the present case, the commission's adoption of a 0.3 percent factor was not an exercise in discretion but an arbitrary selection without any evidence before the commission that the amount of such an adjustment would be adequate to compensate for the erosive trend in the company's rate of return.

Finally, the company argues, in a period of "double digit" inflation and negative earnings growth, adjustments to the company's revenue requirements must be made to provide against that erosion in the allowed rate of return which can reasonably be expected in the immediate future. *Rhode Island Consumers' Council v. Smith,* 111 R. I. 271, 298, 302 A.2d 757, 773 (1973); *Rhode Island Consumers' Council v. Smith,* 113 R. I. 232, 246-47, 319 A.2d 643, 651 (1974).

In the circumstances, the company argues, the commission's adjustment should be set aside and the matter remanded with instructions to the commission to recognize erosive trends in the company's rate of return on the basis of evidence before it.

We agree that under our cases the commission has discretion in the selection of a method of compensating for earnings erosion and, therefore, we do not fault the commission for selecting the method of adding an additional return factor to the overall rate of return in order to

account for anticipated erosion of earnings. But, the real question here is whether the commission's adoption of a 0.3 percent factor is the kind of discretion contemplated by our cases or whether it is merely an arbitrary selection without any evidence that the amount of such an adjustment would be adequate to compensate for the erosive trend in the company's rate of return. We believe it is the latter.

To account for the company's inability to earn in the past the full allowable rate of return, Mr. O'Neill, the company's witness, suggested that an erosion adjustment should be made to increase the company's rate base by $12,808,000, which would increase the company's earnings by $1,332,000. Robert G. Towers, the Rhode Island Consumers' Council witness, argued that before making any adjustment, Mr. O'Neill had provided for all changes in expenses which would affect earnings in the foreseeable future and that Mr. O'Neill's assumption that the rate base would increase by $12.8 million over the test year was highly speculative. However, Mr. Towers gave no evidence to support the 0.3 percent factor. In fact, it appears from the commission's decision that it concluded that neither witness presented an accurate account of the extent of the company's earnings erosion.

The record, as far as we can ascertain, is barren of any evidence to support the commission's finding that the 0.3 percent additional return factor is sufficient to compensate for any erosion of earnings in the foreseeable future. In the absence of such evidence, direct or indirect, the commission's finding is purely speculation and, therefore, must be set aside. In the circumstances the commission's adjustment is vacated, and the matter is remanded to the commission to enable it to reconsider, to make a suitable adjustment on the basis of the evidence before it, and to point out the evidence on which it relies. See the dis-

cussion of controlling guidelines and applicable principles of law hereinbefore set forth.

### (2) Cost of Equity

The company's second argument under the heading of Rate of Return is that the commission's findings regarding the cost of equity were not supported by evidence in the record and further that such findings evince a disregard of the company's investment needs.

During the course of the hearings, three witnesses, two for the company and one for the commission, offered testimony regarding the cost of equity. The estimates they provided ranged from a cost of equity of 11.25 percent, recommended by Mr. Kosh, the commission's witness, to 13 percent and 14.5 percent suggested by the company's witnesses. On the basis of this testimony and the record as a whole, the commission concluded that Mr. Kosh's analysis and resulting recommendation most nearly approximated a fair rate of return for the company.

The company objected that Mr. Kosh's recommendation is founded on a fundamental misconception of the company's investment needs. The company also alleges that the commission has pointed to no evidence upon which to find that Mr. Kosh's suggested return on equity was an appropriate one. It argues generally that the commission's opinion refuted the guideline adopted by this court in *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 293, 302 A.2d 757, 770 (1973), that a utility's rate of return must be adequate to attract necessary capital.

The company further challenges the commission's close scrutiny of its construction programs, particularly those "discretionary" projects which are not mandated by a need to serve additional customers. Specifically, the company disputes the commission's finding that certain of these modernization programs "may indicate imprudent management decisions." In rebuttal to the commission's

finding in this regard, the company asserts that it had offered testimony to the effect that the modernization program was an essential expenditure; that in the long term it would represent a cost savings to the consumer; and that estimated savings in telephone operator wages alone would range upward from $3.5 million. The company further accuses the commission of making unwarranted extrapolations from the levels of construction expenditures by the Bell System elsewhere in New England to predict a similar pattern in Rhode Island. As an aside, the company maintains that the commission exceeded its power of review when it considered the state's unemployment rate and the corresponding inability of consumers to pay higher rates. The company asserts that the ability to pay is a factor to consider in arriving at a rate design but not in computing a rate of return.

Finally the company protests that allowing the commission to scrutinize investment decisions in the manner it has done here permits an unjustified interference with the management prerogative. It argues that unless the record reveals that the company breached the reasonable bounds of business judgment or management discretion, the commission may not supplant the company's judgment on business matters with its own. It cites as authority for this position our own opinion in *United Transit Co.* v. *Nunes*, 99 R. I. 501, 512-13, 209 A.2d 215, 222 (1965).

In arriving at a cost of equity figure of 11.25 percent, the commission, in substance, deletes so much of the company's request for a higher rate as is attributable to the capital investment it requires to implement a planned modernization program estimated to cost approximately $14.9 million. The commission's sole basis for that action is its belief that to opt for that kind of a program in an unfavorable economic climate is an imprudent management decision. In our judgment that conclusion does not

satisfy our requirement that findings be "* * * fairly and substantially supported by legal evidence and sufficiently specific to enable us to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached." *Rhode Island Consumers' Council* v. *Smith*, 111 R. I. 271, 277, 302 A.2d 757, 762 (1973); *see United Transit Co.* v. *Public Util. Hearing Bd.*, 96 R. I. 435, 445, 192 A.2d 423, 429 (1963); *Town of Jamestown* v. *Kennelly*, 81 R. I. 177, 180-81, 100 A.2d 649, 651 (1953).

We do not, of course, question the commission's statement that high interest and unemployment rates, rampant inflation, and reduced consumer demand prevailed when these proceedings were pending before it. These conditions were well-known economic facts of life. But merely to recite them is to do no more than to describe the then state of the economy, and that recital, without more, does not answer the question whether to undertake a modernization program in that economic climate would be unreasonable, or would instead have a pump-priming or stimulating effect on a faltering economy.

It serves no useful purpose, however, to engage at this stage of these proceedings in a discussion of which of those economic theories should prevail. The proper forum for that kind of discourse was the hearing before the commission, but neither the commission in its decision nor the Attorney General or the consumers' council in their briefs have directed our attention to any record evidence supportive of the commission's decision. Yet, as we have already stated, what is critical here is whether the commission's report and order contains supporting evidentiary facts sufficient to demonstrate that its complete rejection of the company modernization program as an influencing factor in determining the rate of return on equity, rather than being arbitrary, was based upon a consideration of legal evidence and that such evidence provided a reason-

able basis for the result reached. Instead of such requisite evidence, however, all we are able to discover is an unsubstantiated economic theory.

In the light of these considerations, it seems that the commission's refusal to fix a rate of return designed to attract the needed capital investment is faulty, not only because it lacks an evidentiary predicate, but perhaps also for the additional reason that it constitutes an unwarranted invasion into a field reserved to management. In *United Transit Co.* v. *Nunes, supra,* this court held that, ordinarily, the determination of what shall be expended in certain areas is a function of management and should not be interfered with absent evidence tending to prove that the projected expenditures unreasonably and unjustly affect the fare-paying public. *Id.* at 512-13, 209 A.2d at 222. While, in that case, this principle was applied to general and administrative expenses other courts have deemed it appropriate to apply the same reasoning to uphold several different types of expenditures. *See, e.g., West Ohio Gas Co.* v. *Public Util. Comm'n,* 294 U. S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761, 769-70 (1935) (advertising or development expenses); *New England Tel. & Tel. Co.* v. *Department of Pub. Util.,* 360 Mass. 443, 482-90, 275 N.E.2d 493, 517-21 (1971) (advertising expenses and charitable contributions); *Latourneau* v. *Citizens Util. Co.,* 125 Vt. 38, 41-42, 46-47, 209 A.2d 307, 311, 314 (1965) (water rights acquisition and president's salary); *cf. Application of Northwestern Bell Tel. Co.,* 78 S. D. 15, 33-34, 98 N.W.2d 170, 180 (1959) (construction of plant).

In view of our holding that the allowed erosion allowance discussed previously and the assigned rate of return on equity appear to be without evidentiary support, the entire matter of the rate of return is remanded for a supplementary decision.

## B.

In the second portion of its brief, the company alleges that in each of several respects the commission's decision is erroneous and contrary to this court's past opinions. Specific allegation is made that the decision is contrary to the principles set out in *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 302 A.2d 757 (1973), and *Rhode Island Consumers' Council* v. *Smith,* 113 R. I. 232, 319 A.2d 643 (1974), and that in each of the areas listed the transgression of those principles mandates reversal by this court.

### (1) Purchases from Western Electric

The first contention made is that the commission erred in arbitrarily disallowing portions of the company's plant cost and operating expenses attributable to purchases of equipment and supplies from Western Electric Company (Western). The company maintains that their rate base was arbitrarily reduced by $2,781,000 and that their depreciation expense was similarly reduced by $70,000. The company goes to great lengths in recounting the facts presented in *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 302 A.2d 757 (1973), pointing out the similarities between that case and this one and suggesting that we, therefore, should attain the same result in the present case as we had in the earlier one, namely, that there was no evidence before the commission which would support the commission's adjustment; that the company had presented uncontradicted evidence that its profits and prices were comparatively low; and that such evidence fulfilled the company's burden of showing the propriety of its transactions with Western.

In support of its argument, the company supplied what appears to be a rather exhaustive list of the evidence presented at the hearings which tended to show the alleged harshness of the commission's position. It is not

necessary to set forth the evidence here, but the thrust of the presentation is that Western's sales are more volatile than those of a utility; that the prices of the products and services sold to the company were lower than prices available elsewhere in the trade; and that Western's profit margin and return on investment is lower than those of comparable industries. The company urges that in the face of this evidence the burden shifted to the council to present contradictory or rebuttal evidence that Western's return on sales to the company was unreasonably high. The company also faulted the commission for accepting witness Towers' formulation, claiming that this was a "* * * conclusionary presentation of a theory which had been previously rejected by this Court as being without sufficient evidentiary value to bear on the question of reasonableness."

Once again, our role in the ratemaking process is to determine whether the commission's decision and order are lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence and are sufficiently specific to enable us to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached. *Town of Jamestown* v. *Kennelly, supra* at 180-81, 100 A.2d at 651. As we stated earlier, the commission's findings enjoy a presumption of reasonableness until shown to be clearly, palpably and grossly unreasonable by clear and convincing evidence.

Remaining cognizant of the company's uncontradicted evidence and protestations that the prices of products and services sold by Western to the Bell operating companies were substantially lower than the prices available in the general trade and that Western's profit margin per dollar of sales and return on net investment is lower than that of comparable companies, the commission nonetheless made special note of witness Towers' assertion that West-

ern's rate of return over a 16-year period was 2.00 percentage points higher than the company's average allowable return over the same period. On this basis the commission concluded that the company's testimony regarding this question, though probative on the issue of reasonableness of Western's return on its sales to the company, was inconclusive. Instead, it held that this evidence must be viewed in the light of the entire record before a finding of reasonableness will be forthcoming. In the instant case, the commission concluded that no such finding would be forthcoming inasmuch as the company failed to meet its burden of showing that its payments to Western were reasonable. The prices paid to Western, therefore, were deemed to be unreasonable to the extent that they yielded to Western a return on its Bell System business greater than that allowable as a rate of return to the company.

It seems to the court that what the commission has accomplished herein is the adoption of the "California Rule" so-called as expressed by the California Supreme Court in *Pacific Tel. & Tel. Co.* v. *Public Util. Comm'n,* 62 Cal.2d 634, 401 P.2d 353, 44 Cal. Rptr. 1 (1965), and as modified by the Oregon Appeals Court in *Pacific Northwest Bell Tel. Co.* v. *Sabin,* 534 P.2d 984, 8 P.U.R. 4th 159 (Ore. App. 1975). This approach to evaluating the propriety of purchases by the company from Western was rejected inferentially in *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 283-86, 302 A.2d 757, 765-67 (1973), and unequivocally in *Rhode Island Consumers' Council* v. *Smith,* 113 R. I. 232, 236-38, 319 A.2d 643, 645-46 (1974). In the latter case we noted that by presenting evidence that Western's prices are substantially lower than the prices charged by other suppliers of the same products and that Western's profit levels are lower than those obtained by other large manufacturing concerns, the com-

pany satisfied its burden of showing the propriety of its transactions with Western. *Id.* at 237-38, 319 A.2d at 646. In reiterating our prior holding we cite with approval the holding of the Supreme Court of Minnesota in *Northwestern Bell Tel. Co.* v. *State,* 299 Minn. 1, 216 N.W.2d 841 (1974). Regarding the propriety of a utility purchase of goods and equipment from a supplier which is the utility's wholly-owned subsidiary, the Minnesota court cited the duty of the commission to carefully scrutinize the prices charged by the affiliate. If such scrutiny reveals the existence of pricing practices on the parts of both the affiliate and its competitors which result in "exorbitant" prices and which "improperly reflect leverage obtained by monopolistic practices," the commission could justifiably disallow that portion of the company's net plant figure and related expenses that reflect these excesses. *Id.* at 22, 216 N.W.2d at 854.

The apparently uncontradicted evidence in the present record is that the prices charged by Western on sales to the company are lower than prices charged for similar products by other suppliers and that Western's profits are lower than those enjoyed by other large manufacturers. Notwithstanding, the commission has elected to ignore our earlier holding and to adopt a rule which we unequivocally rejected. While it has broad authority, it must take the law from this court and leave it either to this court or to the Legislature to initiate changes. Pending those changes, the commission, like other inferior tribunals, is bound by what this court says is the law, even though what we may say is at variance with what it believes is either wise or sound. *Heatherton* v. *Heatherton,* 110 R. I. 144, 148, 290 A.2d 912, 914-15 (1972). In the circumstances, that portion of the commission's report and order which concerns the disposition of purchases from Western is remanded so that the commission may recon-

sider the record evidence, evaluate it in accordance with the rule enunciated in *Rhode Island Consumers' Council* v. *Smith,* 113 R. I. 232, 319 A.2d 643 (1974), and then issue a supplementary decision comporting with its revised findings.

### (2) Wage and Salary Increases

The company made certain "going basis" adjustments (reduction in test-year earnings) to reflect wage and salary increases of 1973 and 1974 which were not in effect during the entire test period but which amounted to $1.31 million. The company's position is that these increases would have an effect on the company's finances beyond the test period and that an adjustment is required to counter that effect. After hearing testimony from the council's witness, Towers, the commission disallowed all but 29.3 percent of the suggested adjustment. The company charges that this result ignored the company's own uncontradicted evidence that its total expenses from 1970 through the end of the test period in June 1974 exceeded actual revenue growth in actual dollar amounts. Specifically, the company alleges that the adjustments allowed by the commission are based on "statistical sophistry"; that no evidence on record supports the commission's conclusion that "* * * improvement in productivity and reduction in work force will enable the Company to absorb a significant portion of the increased wages"; that "Towers' absorption speculation is not *evidence* justifying the type of reduction here made by the Commission"; and that "* * * productivity gains, if any, cannot be set off against a particular expense but must be reflected, if appropriate, in the ultimate revenue requirement * * *." The company offered testimony that wages alone as well as total combined expenses are increasing at a greater rate than revenues and that the growth of total expenses exceeded the growth of revenues from 1970 through the test period.

One step in a rate proceeding is to ascertain the utility's operating revenues and expenses, and to deduct one from the other and thereby to discover the amount of income available to pay "the wages of capital." *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 281, 302 A.2d 757, 764 (1973). In the course of rate proceedings the utility often argues that certain of its expenses should be deducted from its test-year income, thus laying the groundwork for its claim that rates should be increased in order to assure that an ample reservoir of funds will be available to pay interest on debt securities, dividends on stock, and additions to surplus. The current dispute regarding the allowability of wage and salary increases as deductions from test-year earnings arises from such a company contention.

Expenses, including wage and salary increases that affect post test-year finances, are facts which are subject to the commission's scrutiny. It is, therefore, within the commission's power to review the company's allegedly increased expenses and, where probative evidence exists, to adjust those so as to reflect offsetting factors such as sales growth, increased efficiency, or work force reductions. In this situation, as in all others, the commission's findings must be fairly and substantially supported by legal evidence. *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 277, 302 A.2d 757, 762 (1973).

Although the report and order is by no means crystal clear in this respect, it appears that the commission has been persuaded by witness Towers' opinion that if the factor of wage increases is to be singled out as a basis for a going-basis adjustment, it is to be similarly singled out for purposes of the commission's examination. In short, the commission rejected the view expressed by the company that the difference between the test-period increases in total expenses and total revenues is controlling

in determining allowable wage and salary deductions. Rather, the commission adopted the view in this case that the allowable deduction should be determined by ascertaining the proportion of increased total expense that wages and salaries alone represent. Pursuant to this standard, the commission found that from the historical year 1970 through the end of the test year, wage expenses increased from 32.97 percent to 36.35 percent of revenue. Therefore, the conclusion was reached that the going basis adjustment should reflect only this 3-plus cents per dollar of revenue increase. In further pursuance of this isolated examination of wage and salary increases, the commission cited a responsibility to "* * * analyze all factors which relate to that item to insure that any adjustment made is accurate." In this vein the commission propounded its conclusion that improvement in productivity and reduction in work force would permit the absorption of a significant portion of the wage and salary increases. This finding was based on what was referred to by the commission as "compelling and substantially unrebutted" evidence and was made expressly in the face of the company's comparisons of total revenues and expenses for the test period. Any setbacks suffered by the company in this latter respect, the commission maintains are accounted for in the overall findings reached in this rate case.

The inclusion or exclusion of any portion of the company's suggested wage adjustment was an issue subject to a difference of opinion. The commission, in its report and order, made specific reference to, and obviously found persuasive, the prepared testimony and analysis of Robert G. Towers. Although he was compelled, upon cross-examination, to reduce his recommended disallowance from 88.9 percent of the requested going basis wage adjustment to 70.7 percent, the basic facts upon which he based his conclusion remain substantially unrefuted. Specifically,

the witness represented to the commission and the commission accepted as fact, that a significant· portion of the wage and salary increases claimed by the company as part of its going-basis adjustment were offset by increases in productivity and efficiency. The commission also accepted Mr. Towers' testimony under cross-examination that wage and salary expense as a percent of revenue increased from 32.97 percent to 36.35 percent between 1970 and the end of the test year. The commission's decision to allow only 29.3 percent of the company's adjustment finds support in the evidence. Therefore, we will not disturb that conclusion. *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 277, 302 A.2d 757, 762 (1973).

We find no merit to the company's argument that *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 283, 302 A.2d 757, 765 (1973), stands for the proposition that (1) a witness' opinion regarding absorption of wages is not evidence justifying a reduction of the type effected by the commission here and (2) that productivity gains, if any, cannot be set off against a particular expense but must be reflected in the ultimate revenue requirement. That case merely held that on the facts before the court and in the context of the alleged applicability of certain unspecified federal guidelines to a suggested disallowance, the court could not rule on the soundness of such disallowance where the parties had failed to pinpoint the relevant guidelines. We fail to perceive how this narrow ruling inescapably gives rise to the inferences proposed by the company that an expert's surmisal of a situation cannot constitute evidence and that productivity cannot be offset against certain isolated expenses.

### (3) Working Capital

We open the present discussion with the now familiar definition of cash working capital as the " '* * * amount of cash required to operate a utility during the interim

between the rendition of service and the receipt of payment therefor. It is the blood stream that gives life to the physical plant and facilities of the enterprise.' " *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 288-89, 302 A.2d 757, 768 (1973), *quoting Pittsburg* v. *Pennsylvania Public Util. Comm'n,* 370 Pa. 305, 309, 88 A.2d 59, 61 (1952). The interim between rendition of service and receipt of payment is known as the "lag." When, upon examination of the evidence, the commission settles upon a suitable lag period, the commission proceeds to compute the working capital allowance — a proportion of the telephone company's test-year expenses (less depreciation expense) equal to the proportion of the test year that the lag period represents. For example, if the lag is found to be 36.5 days, and the test year is 365 days long, the cash working capital will amount to one-tenth of the company's test-year telephone expenses (less depreciation expense). The final figure is merely added to the company's rate base and is reflected in the ultimate rate structure.

In this case, the company presented a lag study which, it was argued, established the working capital requirement on an intrastate basis for the 12 months ending June 30, 1974, of $11,052,538. This represents a composite lag of 81.91 days.

The council argues that a more realistic working capital allowance is $3,439,000, representing a suggested lag of 27.27 days.

To a great extent the discrepancy between the two sets of figures derives from a dispute between the parties regarding their perceptions of the state gross receipts tax and whether current payments of said tax cover liabilities accrued by the company during the previous year or the current year. For reasons that will become apparent be-

low, we do not here consider any of the issues raised regarding the character of the gross receipts tax.

The commission saw merit in the arguments presented by both the company and the council but ultimately rejected both positions and once again hung its administrative hat on the "* * * widely-used method of using 45 days operating expenses and taxes as a reasonable treatment for assuring the Company adequate working capital."

While it is indeed accepted that the sum necessary for working capital is addressed to the sound discretion of the Public Utilities Commission, *Rhode Island Consumers' Council* v. *Smith,* 113 R. I. 384, 401, 322 A.2d 17, 26 (1974), and while we admire the commission's decision to "persevere" in applying the 45-day lag in the face of judicial adversity, we must also persevere in our view that legal evidence, and not a "rule of thumb," is the probative indicator of working capital requirements. The commission offers no substantiation for its compromise figure of 45 days other than its seemingly spontaneous assertion that this is "the fairest method of resolving the issue." The commission's argument on appeal that the 45-day lag is not a rule of thumb but an application of legal precedent established in *Rhode Island Consumers' Council* v. *Smith,* 113 R. I. 384, 401, 322 A.2d 17, 26 (1974), is without merit. We held in the very case relied on that "[t]he determination of the amount to be allowed as cash working capital is a question of fact, varying with the circumstances of each case." *Id.* at 401, 322 A.2d at 26, *citing Central Maine Power Co.* v. *Public Util. Comm'n,* 156 Me. 295, 163 A.2d 762 (1960). No attempt was made in this case to reconcile the facts and testimony gathered at the hearing with the ultimate conclusion that the 45-day lag was fair and reasonable.

We do not attempt here to determine what an appropriate working capital figure would be nor will we usurp

the commission's factfinding powers by ruling on those questions regarding credits for gross receipts tax payments. We remand the entire question of working capital allowance to the commisison so that it may properly exercise its factfinding responsibility in a supplementary decision.

### (4) Plant Under Construction

One point of disagreement in this case is whether it is proper to include in the company's rate base an amount in excess of $6 million representing plant under construction. As we understand the company's proposition, it is arguing that by including plant under construction in the rate base and by crediting earnings at a capitalized rate, the company seeks only to obtain the difference between the capitalization rate and the rate of return. Unless this plant under construction item is included in the rate base, the company argues, it will be impossible for the company to achieve the approved return on equity. The company concluded that because its witness' testimony on this point was uncontradicted, it was error for the commission to abide by its past practice of excluding plant under construction from the rate base.

The dispute, in this instance, hinges on one's choice of accounting methods. The commission, in the exercise of its broad discretion, expressed a preference for the analysis of this item as profferred by the witness Towers and accordingly excluded the item from the company's rate base. We will not interfere with the commission's methodology as long as the end result is fair and reasonable. *Narragansett Elec. Co. v. Kennelly*, 88 R. I. 56, 71-72, 143 A.2d 709, 718-19 (1958); *FPC v. Hope Natural Gas Co.*, 320 U. S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345 (1944). A search of the authorities indicates that the general and accepted practice in this area is, in the interest of simplicity, to exclude plant under construction

from the rate base altogether. This works no injustice upon the company or its investors insofar as the interest charged construction is capitalized and the return on the property is realized after construction is finished and the property is placed into service. Rose, *The Bell Telephone System Rate Cases*, 37 Va. L. Rev. 699, 710 (1951); *see also Re Consolidated Edison Co.*, 96 P.U.R. (n.s.) 194, 378-79 (N.Y.P.S.C. 1952). That appears to be the situation here. The company is compensated for the capital costs of construction by the capitalization of interest during construction and the collection of such amounts from rate payers in the form of depreciation charges. This view is consistent with our holding that a utility's rate base is the amount of used and useful property which it necessarily devotes to rendering the regulated services. *Rhode Island Consumers' Council* v. *Smith*, 111 R. I. 271, 286, 302 A.2d 757, 767 (1973). Property under construction is clearly not used in the rendering of regulated services and as long as its exclusion from the rate base was found by the commission to be nonconfiscatory, we will not disturb the commission's finding. It appears from the transcripts and hearing exhibits that this is a fair and reasonable result.

## C.

The only question remaining to be decided in this case is whether this court may direct the commission upon remand, to authorize the company to recoup revenues lost during the pendency of this court's review of an erroneous commission decision. In essence, the company urges that this court should herein direct the commission, in its supplemental decision, to allow the implementation of a rate plant that would increase the company's revenue retroactively to the date of the allegedly wrongful order that is presently being considered. In short, the company asserts that it is entitled to earn what is ultimately determined

to be a fair return from the date that the original report and order were issued.

A fundamental rule of ratemaking is that rates are exclusively prospective in nature. Future rates may not be designed to recoup past losses. *Rhode Island Consumers' Council* v. *Smith,* 111 R. I. 271, 292, 302 A.2d 757, 770 (1973); *Bebchick* v. *Washington Metropolitan Area Transit Comm'n,* 485 F.2d 858, 865 (D.C. Cir. 1973). The fundamental reason underlying this principle is that when a commission pronounces that a specific rate is a "reasonable and lawful rate for the future," that pronouncement has the force and effect of a statute. *Arizona Grocery Co.* v. *Atchison, T.&S.F. Ry.,* 284 U. S. 370, 386 & n.15, 52 S.Ct. 183, 185 & n.15, 76 L.Ed. 348, 354 & n.15 (1932). The Supreme Court of the United States has further held that to give such a pronouncement retroactive effect requires "the clearest mandate." *Claridge Apartments Co.* v. *Commissioner,* 323 U. S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139, 153 (1944).

Several cases have addressed the applicability of this principle of prospectivity to rate cases. In two cases where retroactive relief was denied, the courts specifically addressed the problem of a utility's entitlement to recoupment of losses suffered as a result of a wrongful stay of an order. In *Bebchick* v. *Washington Metropolitan Area Transit Comm'n, supra,* the court held that "* * * the risk of loss from stay of a rate order must be borne by the utility, even if the stay was wrong." *Id.* at 864. Similarly, in *Democratic Central Comm.* v. *Washington Metropolitan Area Transit Comm'n,* 436 F.2d 233 (D.C. Cir 1970), the same court held it to be settled that losses which occur in the past, even though they result from an improvidently awarded stay, may not be recovered by fares charged in the future. *Id.* at 236.

These cases are analogous to the case at bar, the only

difference being that, where the Washington cases concerned the postponement of the attainment of a lawful return by wrongful stays, the company in the instant case alleges the postponement of its lawful return due to the implementation of an allegedly confiscatory rate order. We believe that this case, like the Washington cases, is controlled by the principle of prospectivity which precludes recoupment of the kind sought here.

Two other cases, urged by the company as support for its position that certain circumstances require the retroactive application of the fair return ultimately settled upon, should be distinguished from the case at bar. *Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n*, 330 A.2d 236 (App. D.C. 1974), concerned a rate-setting procedure that was statutorily divided into two phases. Phase I, so-called, was that part of the procedure whereby the fair rate of return was determined. This was followed by Phase II, during which a rate design was formulated to effectuate the Phase I findings. In *Chesapeake*, the company sought to have implemented an interim rate plan that would permit them to earn the approved Phase I return pending the completion of Phase II. The commission acknowledged the need for interim relief but proposed that such funds be collected as a surcharge after conclusion of the Phase II hearings in order to avoid a disproportionate exaction from any one class of users. In response to this commission stance the company requested the court to direct the commission to implement the interim plan immediately. Citing the statutory power of the commission to fashion such interim relief, the court upheld its interim rate plan. In so holding, the court dismissed the allegation that this surcharge was illegal insofar as it was collected to pay for a loss previously incurred. By its Phase I order, the commission had declared that the company was entitled to earn a specified return

prospectively from the date of that order. All that remained for the commission was to ascertain the exact source of the revenues that would go to satisfy that return. Pending that determination in Phase II, the company was not permitted to collect the additional revenues. The suspension of the nonretroactivity principle therefore was limited, in this case, to "* * * the imposition of a newly established rate of return on an interim basis for the reason that it [was] not collectible during that period, but in the future." *Id.* at 241.

A second case relied upon by the company is *In re New England Tel. & Tel. Co.*, 131 Vt. 310, 305 A.2d 598 (1973). In that case, the Vermont Public Service Board had exercised its statutory power to suspend the implementation of a new rate schedule for 6 months during hearings on the reasonableness of the new rates. A Vermont statute, Vt. Stat. Ann. tit. 30, §227(a) (1970), provides that if no final order has issued from the board at the expiration of the 6-month suspension, the company's plan may be implemented under bond. In this case the board issued no such order but, instead, ordered that the company's new rate schedule be further suspended pending a final determination of the case. In holding that this was no order at all within the meaning of Vt. Stat. Ann. tit. 30, §227(a) (1970), the court held that the statute mandated the immediate implementation of the new rate schedule under bond retroactive to the expiration of the legal 6-month suspension. *Id.* at 315-17, 305 A.2d at 601-02. This apparent breach of the nonretroactivity principle does not indicate a similar course in the instant case, because the Vermont holding gave to the utility the right to collect no more than that to which it was statutorily entitled to collect prospectively from the expiration of the 6-month period.

The distinction between the case at bar and the two

cases discussed immediately above is clear. In both of those cases, the courts held that the revenues collected by the utilities, though superficially appearing to be recoupment for past losses, were in fact deferred collections of presently effective rates. In the case at bar, the company asks this court to permit calculation of future rates on the basis of known past losses, to wit, losses resulting from the operation of an allegedly wrongful order. This is precisely what the courts in *Bebchick* v. *Washington Metropolitan Area Transit Comm'n,* and *Democratic Central Comm.* v. *Washington Metropolitan Area Transit Comm'n,* both *supra,* found to be violations of the nonretroactivity principle.

Another rule of law that lends support to the principle of nonretroactivity is that current rates that are in force pursuant to a commission order enjoy a presumption of validity. This principle is one aspect of the rule that commission orders have the force of statutes, *Arizona Grocery Co.* v. *Atchison, T.&S.F. Ry., supra,* and has been expressed by one court as follows:

> "* * * so long as the rates established by the commission are in force, they are presumed to be reasonable, and neither the commission nor the courts have power retroactively to declare such established rates unreasonable * * *." *Montana Horse Prod. Co.* v. *Great Northern Ry.,* 91 Mont. 194, 209, 7 P.2d 919, 925 (1932).

We have already stated that the commission's findings enjoy a presumption of validity. We believe this presumption would be meaningless if it did not apply with equal force to rates allowed under the order that is based on those findings. We hold therefore that established rates are presumed to be valid while they are in force and that neither the commission nor the court has the power to alter such rates retroactively. *Michigan Bell Tel. Co.* v. *Public Serv. Comm'n,* 315 Mich. 533, 544, 24 N.W.2d 200,

204 (1946). This holding is accompanied by the caveat that a rate schedule which represents a deprivation of due process either in its inability to provide a fair return or in the grossly excessive time it took to correct good faith errors of the commission in arriving at the new rates would certainly entitle the company to some sort of extraordinary relief. See *Hope Natural Gas Co.* v. *FPC*, 196 F.2d 803, 809 (4th Cir. 1952).[5]

Holding that current rates are presumed valid is consistent with the often repeated warning that a utility company, by commencing a rate proceeding, impliedly accepts all the risks inherent in that course of action. *FPC* v. *Tennessee Gas Transmission Co.*, 371 U. S. 145, 152-53, 83 S.Ct. 211, 215, 9 L.Ed.2d 199, 204-05 (1962); *Bebchick* v. *Washington Metropolitan Area Transit Comm'n*, *supra* at 864. One court has stated:

> "Whether a rate established by a regulatory commission will yield more or less than a fair return during its continuance is a risk of the business, in the absence of a judicial determination of its unreasonableness. The lag which accompanies the making of rate changes is a major problem in utility regulation. The commission may not amortize a loss or make a rate sufficiently low to recapture any excess. So the rule cuts both ways." *Mississippi Pub. Serv. Comm'n* v. *Home Tel. Co.*, 236 Miss. 444, 456, 110 So.2d 618, 624, 28 P.U.R.3d 473, 479 (1959). See *Re New York Tel. Co.*, 20 P.U.R.3d 129, 155 (N.Y. P.S.C. 1957).

Finally, the company argues that G. L. 1956 (1969 Re-

---

[5]We note at this point that since the failure of a commission order to provide an adequate return in the past cannot be corrected retroactively, it follows that the commission is bound to exert every reasonable effort to eliminate unnecessary regulatory delay. *General Tel. Co.* v. *Public Serv. Comm'n.*, 341 Mich. 620, 632, 67 N.W.2d 882, 887 (1954).

enactment) §39-5-4, as amended,[6] which allows this court to grant a temporary stay of a commission order, cannot be construed to deny this court the authority to remedy an injury resulting from its refusal to grant such a stay. The company urges that denying the court the power to order the implementation of retroactive rates is a "strained interpretation" of §39-5-4, which forces the court, on the basis of summary proceedings, to either (1) irrevocably deny relief at great potential loss to the company, or (2) to grant temporary relief subject to modification after judicial review.

We cannot agree with the company's construction of §39-5-4. That section is part of a complex statutory scheme which carefully delineates the powers of both the commission and the courts in a rate proceeding. Section 39-5-4 provides specifically that if the company feels aggrieved by the commission's order, its remedy is to seek a stay of that order pending judicial review thereof. The section further provides that if such a stay is to issue,

---

[6]General Laws of 1956 (1969 Reenactment) §39-5-4, as amended, provides:

"Powers of supreme court.—The supreme court may reverse or affirm the judgments and orders of the commission and may remand a cause to it with such mandates, as law or equity shall require; and the commission shall enter judgment or order in accordance with such mandates. The transfer of the cause to the supreme court shall not vacate or operate as a stay of any judgment or order of the commission, but the supreme court, or when not in session, a justice thereof, upon notice to interested parties, may suspend execution of the same with or without terms or conditions as justice and equity require; provided, however, that the execution of rate orders shall not be suspended at the request of a utility company unless the company files with the commission a bond running to the commission in an amount and with sureties approved by the court or a justice thereof conditioned that within thirty (30) days after the termination of the proceedings the company shall repay to the persons from whom collected from and after the effective date of the commission's final order all sums in excess of the rates finally determined to be just and reasonable."

the public's interest is to be safeguarded by the posting of a bond by the company to the commission in an amount determined by the court for purposes of refunding excess sums to the rate payers.

We fail to perceive how a statute so specific in its detailing of the company's remedy can be construed to permit so sweeping a remedy as retroactive rate-setting. Whether the omission of such a provision from the statute is wise is not for the court to say. That is the province of the Legislature. We are bound, therefore, to hold that §39-5-4 provides that application to this court for a stay of a rate order is the company's exclusive remedy in these circumstances.

That we reject the company's contention that this enactment is not sufficiently broad to permit the entry of an order at this juncture of these proceedings to recoup revenues lost during the pendency of our review of a partially erroneous commission decision does not mean that the company is barred from reapplying for a stay or that this court in the event of such a reapplication will be bound by its earlier denial of a similar application.

## Conclusion

The records certified to this court are ordered returned to the commission with instruction to the commission to review the evidence and testimony in the present record as supplemented by such further testimony as may be offered by the parties or by the commission's own direction. On the basis of this record so supplemented, the commission is directed to make further findings and orders in harmony with this opinion. The commission's hearing on remand is to be limited to those portions of the original report and order specifically found by this court to be lacking in evidentiary support, that is, the rate of return, the purchases from Western Electric and the working capital allowance. Any party dissatisfied with said de-

cision may, by motion filed in this court within 20 days following the commission's action, bring the matter before us for further consideration. In that event it will be set down for argument upon the briefs now before us and upon such supplemental record and briefs as may be required. Jurisdiction of the matter is retained by this court for the review of the commission's supplementary decision and amended order.

Mr. Chief Justice Roberts did not participate.

*Tillinghast, Collins & Graham, Peter J. McGinn, Andrew A. DiPrete, Edwin K. Hall, C. Duane Aldrich,* Boston, Mass., for petitioner.

*Julius C. Michaelson,* Attorney General, *Gregory L. Benik,* Special Asst. Attorney General, *Roberts & Willey Incorporated, Dennis J. Roberts, II,* on behalf of Rhode Island Consumers' Council, respondents.