In re ISLAND HI–SPEED FERRY, LLC.

Nos. 99–150–M.P., 99–151–M.P. and 99–155–M.P.

Supreme Court of Rhode Island.

Feb. 21, 2000.

Mark Jay Hagopian, Jon G. Hagopian, Providence, for High Speed Ferry, Plaintiff.

Lauren E. Jones, Providence, Michael R. McElroy, for Interstate Navigation Co., Plaintiff.

Merlyn P. O'Keefe, Peace Dale, for Town of New Shoreham, Plaintiff.

John Spirito, Jr., Providence, for Public Utilities Commission, Defendant.

Paul J. Roberti, for Assistant Attorney General, Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## O P I N I O N

GOLDBERG, Justice.

This case came before the Court on statutory petitions for certiorari brought by Island Hi–Speed Ferry, LLC (Hi–Speed), Interstate Navigation Company d/b/a The Block Island Ferry (Interstate), and the Town of New Shoreham (the Town) pursuant to G.L.1956 § 39–5–1. On May 27, 1999, petition Nos. 99–150–M.P., 99–151–M.P., and 99–155–M.P. were consolidated for briefing and oral argument. All three petitions seek review of a March 31, 1999, report and order of the Public Utilities Commission (the Commission) issued in docket No. 2802. The facts pertinent to this case follow.[1]

This voyage began on February 20, 1998, when Hi–Speed filed an application with the Commission's Division of Public Utilities and Carriers (the Division) for a Certificate of Public Convenience and Necessity to operate a passenger ferry ser-

---

1. The facts of this case have been gleaned from the Commission's report and order issued in docket No. 2802, as well as the Division's report and order of August 25, 1998, issued in docket No. 98 MC 16.

vice from the Port of Galilee in Narragansett to New Harbor in New Shoreham (Block Island) by way of a high speed catamaran designed to accommodate 149 passengers. Interstate, a company that provides passenger, motor vehicle, and freight service between Galilee and Old Harbor, Block Island, and Hi–Speed's potential competitor, filed a protest and motion to intervene, which was granted by the Division. Thereafter, the Town filed a similar protest and motion to intervene, which was also granted.

After conducting hearings, the Division issued a report and order on August 25, 1998, concluding that,

"[t]hrough a review of the record, the Division has determined that the Applicant is fit, willing and able to conduct the proposed ferry service. The Division has also determined, after a review of the entire record of the proceeding, that the Applicant has satisfied the burden of proof to show that there is a public convenience and necessity for the proposed service as described in the record of the proceeding."

Accordingly, the Division approved Hi–Speed's application subject to several conditions, including a requirement "[t]hat the Applicant file with the [Commission] and have approved, tariffs reflecting the rates and charges outlined in the business plan."

In accordance with the Division's order, Hi–Speed filed a "Local Tariff Naming Passenger Rates Applying Between Points in the State of Rhode Island" with the Commission, along with a petition pursuant to G.L.1956 § 39–3–12[2] seeking a waiver of the hearing and investigation requirements of § 39–3–11[3] relative to its rates, tolls, and charges; a motion pursuant to Rule 2.3(a) of the Rules of Practice and Procedure of the Public Utilities Commission that it be exempt from the rate filing requirements of Part Two of the Rules of Practice and Procedure; and a motion to have its rates and schedules approved by the Commission as filed, to become effective thirty days from the date of filing. In its supporting memorandum of law, Hi–Speed cited the need for expedited Commission approval in order to acquire and launch the high speed catamaran in time for the 1999 season. Shortly after Hi–Speed filed its rates with the Commission, both the Town and Interstate embarked on a mission seeking intervenor status in order to contest the filing and frustrate Hi–Speed's efforts to launch its operation in time for the 1999 summer season. Both parties were allowed to intervene over Hi–Speed's objection.

After a public hearing at which the parties offered oral arguments in support of their various positions, the Commission determined that there was insufficient evidence before it to approve Hi–Speed's proposed rates, and directed Hi–Speed to submit further evidence in support of the proposed rates. Subsequently, Hi–Speed filed a financial operating analysis provided by its expert witness, a copy of that

**2.** Section 39–3–12 provides, in part:

"[T]he commission may, in its discretion and for good cause shown, allow changes within less time than required by the notice specified in § 39–3–11, and without holding the hearing and investigation therein provided for, or modify the requirements of § 39–3–11 with respect to filing and publishing tariffs either in the particular instance or by general order applicable to special or particular circumstances or conditions, or may enter an interim order prescribing a temporary schedule of rates, tolls, and charges pending the completion of its investigation."

**3.** Section 39–3–11(a) provides, in pertinent part:

"Whenever the commission receives notice of any change or changes proposed to be made in any schedule filed under the provisions of § 39–3–10, the commission shall hold a public hearing and make investigation as to the propriety of the proposed change or changes. * * * Notwithstanding the provisions of this section, the commission shall periodically hold a public hearing and make investigation as to the propriety of rates when charged by any public utility and shall make such order in reference to the rate, toll, or charge as may be just."

witness's testimony that was rendered before the Division, a copy of Hi–Speed's business plan that had been presented to the Division, and a copy of the testimony of another expert witness. In response, Interstate filed a comparison of first year (May–October) operating figures previously submitted by Hi–Speed, an appendix of supporting materials, and the testimony of its own expert witness.

Thereafter, the Commission conducted eleven days of public hearings on Hi–Speed's proposed rates. In a written order issued on March 31, 1999, the Commission concluded "that it is premature to establish conventionally calculated rates for [Hi–Speed]," reasoning that "forecasting a reasonably certain level of ridership-related revenues for a start-up ferry company like [Hi–Speed] in its first year of operations is problematical." Therefore, the Commission ordered, in part:

"1. That Island Hi–Speed Ferry, LLC's September 18, 1998 petition requesting that the Commission waive the hearing and investigation requirements of [G.L. § ] 39–3–11 relative to its rates, tolls and charges is hereby denied.

"2. That Island Hi–Speed Ferry, LLC's September 18, 1998 motion seeking an exemption from the rate filing requirements of Part Two of the Commission's Rules of Practice and Procedure, is hereby denied in part and granted in part, as specified herein.

"3. That Island Hi–Speed Ferry, LLC's September 18, 1998 motion seeking approval of its filed rates and schedules is hereby approved, for the season from May 14 through October 11, 1999, as modified by Island Hi–Speed Ferry, LLC's October 13, 1998 amended tariff filing (IHSF Exh. 4), which is also hereby approved."

On certiorari, Hi–Speed, Interstate, and the Town and raise numerous issues relative to the Commission's order and the propriety of the order that granted the motions to intervene. Additional facts will be supplied as necessary to address those issues.

## I

### Mootness

■ In its order, the Commission approved Hi–Speed's filed rates and schedules "for the season from May 14 through October 11, 1999." It was asserted at oral argument that because the 1999 season has passed, review of the Commission's order is useless and therefore this case is now moot. We disagree, and conclude that in light of the administrative gridlock that has precluded Hi–Speed from getting a vessel in the water for the past two summers, this case presents a factual situation "that is likely both to recur and yet to evade judicial review." *Sullivan v. Chafee,* 703 A.2d 748, 753 (R.I.1997). Therefore, we shall decide the case at this time.

Further, we conclude that the Commission's approval of Hi–Speed's filed rates and schedules, although technically for the 1999 season, was in effect an approval of Hi–Speed's rates and schedules for its initial year of operation, regardless of when that commences. This is evidenced by the Commission's conclusion that it was "premature to establish conventionally calculated rates" for Hi–Speed, and would only be able to do so after an initial test year. Thus, notwithstanding the technical language of the Commission's decision that the rates were approved for the 1999 season, we conclude that the order shall be effective for the initial season during which Hi–Speed is in operation, subject to any modifications Hi–Speed deems necessary in light of the marked increase in fuel costs as disclosed at oral argument. Therefore, Hi–Speed shall not be required to seek the Commission's approval of a new rate for the company's initial season.

## II

### Jurisdiction

Next we shall consider whether the Commission has the power to investigate

the propriety of the initial rate filing of a public utility. This is a question of first impression for this Court, owing primarily to the dearth of start-up utilities in this state. The petitioner Hi–Speed argued that under §§ 39–3–10 and 39–3–11, the Commission lacks subject matter jurisdiction to investigate such a filing. Instead, Hi–Speed argued that § 39–3–10 [4] is essentially a "file and run" statute which allows a public utility to establish its own initial rates, and that § 39–3–11 [5] empowers the Commission to hear and make investigation as to the appropriateness of filed rates only when a public utility proposes changes in its rates. For the following reasons, we disagree with both contentions.

In *Town of East Greenwich v. O'Neil,* 617 A.2d 104 (R.I.1992), we discussed the intent of the General Assembly to vest the Commission with the exclusive authority to regulate public utilities. *Id.* at 109 (citing *South County Gas Co. v. Burke,* 551 A.2d 22 (R.I.1988); *In re Woonsocket Water Department,* 538 A.2d 1011 (R.I.1988)). Further, we recognized that "[t]itle 39 is replete with examples of the broad reach of the commission's authority." 617 A.2d at 110. General Laws 1956 § 39–1–1(c) vests the Commission with the "exclusive power and authority to supervise, regulate, and make orders governing the conduct of companies offering [energy, communication, and transportation services] to the public" for the purpose of protecting the public against improper and unreasonable rates. Additionally, § 39–1–3(a) provides the Commission with the "jurisdiction, powers, and duties * * * to hold investigations and hearings involving the rates, tariffs, tolls, and charges" of a public utility.

■■■■ In light of this broad mandate, we conclude that although § 39–3–10 may be construed as a "file and run" statute wherein a start-up utility may simply file a rate with the Commission without requiring initial approval of that rate, the Commission has the authority to *sua sponte* investigate the rates of a public utility at any time. Further, we conclude that the Commission has broad authority under § 39–3–11 to review and approve the rates of a public utility, whether an initial rate or a proposed change of existing rates, and is mandated to periodically review and hold public hearings respecting those rates in the absence of any proposed rate change. Therefore, we are satisfied that the Commission has subject matter jurisdiction to determine the propriety of the initial rate filing of a public utility, particularly where, as in this case, the Division's Certificate of Public Convenience and Necessity is conditioned upon the initial rate filing approval of the Commission.

## III

### Intervenors

■■■ The next issue for our consideration is whether it was unlawful and unreasonable for the Commission to grant intervenor status to both the Town and Interstate. Hi–Speed argued that neither the Town nor Interstate had a right to intervene in the rate proceedings before the Commission, asserting that Interstate was acting solely out of its own financial self-interest and that the Town's interests were adequately represented by the Division and the Attorney General.[6] We dis-

---

4. Section 39–3–10 provides, in pertinent part, that "[e]very public utility shall file with the public utilities administrator * * * schedules which shall be open to public inspection, showing all rates, tolls, and charges which it has established and which are in force at the time for any service performed by it within the state * * *."

5. For the relevant portion of § 39–3–11, see *supra,* note 3.

6. The Division, which is represented by the Department of the Attorney General in all administrative and legal proceedings, is statutorily charged with representing the interests of the public, as its advocate, in rate proceedings before the Commission. *See* G.L.1956 §§ 39–1–1(b), 39–1–19(b); *Providence Gas Co. v. Burke,* 419 A.2d 263 (R.I.1980); *Narragansett Electric Co. v. Harsch,* 117 R.I. 395, 368 A.2d 1194 (1977).

agree, and for the following reasons affirm the decision of the Commission to grant intervenor status to both the Town and Interstate.

General Laws 1956 § 39–5–4 grants to this Court the power to "reverse or affirm the judgments and orders of the commission and may remand a cause to it with such mandates as law or equity shall require." Section 39–5–3 prescribes more certain guidelines for review by this Court:

> **"Findings of commission.**—The findings of the commission on questions of fact shall be held to be prima facie true, and as found by the commission and the supreme court, shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the commission made in the exercise of administrative discretion shall not be reversed unless the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably."

We have previously held that this Court will examine a ruling by the Commission "to determine whether it is lawful, reasonable, and substantially supported by the evidence," but will not engage in fact-finding nor weigh the evidence that was presented to the Commission. *Woonsocket Water*, 538 A.2d at 1013–14 (citing *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 446 A.2d 1376 (R.I.1982)). Further, in *Woonsocket Water*, we held that "[t]his [C]ourt is ill equipped to second-guess the multifarious nature of commission decisions." 538 A.2d at 1014. It is in light of this limitation to our power of review that we consider the Commission's grant of intervenor status to the Town and Interstate.

The Commission's standard for determining whether to grant intervenor status to a party, which is contained in Rule 1.13 of the Commission's Rules of Practice and Procedure, is liberally drawn in order to ensure that the interests of interested parties are met through the adversarial process. Subsection (b) of Rule 1.13 provides:

> *"Who may Intervene.* Subject to the provisions of these rules, any person claiming a right to intervene or an interest of such nature that intervention is necessary or appropriate may intervene in any proceeding before the Commission. Such right or interest may be:
>
> "(1) A right conferred by statute.
>
> "(2) An interest which may be directly affected and which is not adequately represented by existing parties and as to which movants may be bound by the Commission's action in the proceeding. (The following may have such an interest: consumers served by the applicant, defendant, or respondent; holders of securities of the applicant, defendant, or respondent.)
>
> "(3) Any other interest of such nature that movant's participation may be in the public interest."

Although the Commission found a direct interest in the outcome of the proceedings on the part of both the Town and Interstate when it initially granted intervenor status, in its final order the Commission questioned the motives of the Town and of Interstate, specifically with respect to both parties' "ridership" projections, which the Commission found to be "self-serving and of questionable value," noting that while Hi–Speed's projections remained constant throughout the entire rate proceeding, both the Town and Interstate increased their projections toward the end of the rate case. The Commission queried whether those increases "were more to do about impeding [Hi–Speed] from going into business, than about actually establishing just and reasonable rates for [Hi–Speed]." Further, the Commission found Interstate's rate calculation approach to be "self-serving and without merit," and found the Town's expert witness had "clearly expressed her underlying bias against permitting a high-speed ferry service to Block Island in the first place" during questioning by Hi–Speed's attorney. Finally, the Attorney General acknowledged at oral argument that the in-

tervention of the Town and Interstate at the rate setting level was ill-advised.

In light of the Commission's concern about the intervenors' motives, and in light of the precarious position in which Hi–Speed was placed by having to defend against its competitor before the Division and again before the Commission, the wisdom and appropriateness of the interventions in this case was questionable. However, although the intervention may have been overly burdensome to Hi–Speed, we cannot say it was clearly wrong. We therefore conclude that the Commission's order allowing the Town and Interstate to enter into the rate proceedings was neither unlawful nor unreasonable.

## IV

## Methodology

■■ We shall now consider the reasonableness of the methodology utilized by the Commission in adopting the rates proposed by Hi–Speed, as well as the propriety of the Commission's setting a revenue cap for Hi–Speed's initial year. Again, this Court's review of decisions of the Commission is extremely deferential in light of the fact that the Commission possesses a unique, specialized expertise and the ability to consider the complex social, economical, and technical information required to set public utility rates that are fair and reasonable. Further, we reiterate that the Commission has exclusive jurisdiction to make such orders as it deems necessary to protect consumers and to ensure the economic viability of the utility.

■ It is important to further note that this Court has held that "[n]o particular formula binds the commission in formulating its rate decision; the sole requirement is that the ultimate rate be fair and reasonable." *Woonsocket Water,* 538 A.2d at 1014 (citing *Bristol County Water Co. v. Harsch,* 120 R.I. 223, 232, 386 A.2d 1103, 1108 (1978)). Therefore, the rate that the Commission approves "carries a presumption of reasonableness that remains until the contrary is proven." *Id.*

■ In the order approving Hi–Speed's proposed rates, the Commission acknowledged that it had taken measures to calculate a reasonable cost of service and profit margin for Hi–Speed and its investors, and to establish a profit ceiling in order to protect ratepayers from any excessive profits earned by Hi–Speed's investors. The Commission concluded that it was "taking the most prudent and practical approach to establishing just and reasonable rates for this start-up ferry company," and that although the rate-making approach utilized was admittedly "somewhat divergent from previous Commission rate-setting methodologies," the unique facts and circumstances involved in Hi–Speed's case warranted a "unique regulatory rate treatment." We conclude that it was well within the discretion of the Commission to make these judgment calls based upon the unique factual situation presented, and therefore the decision to utilize this methodology to adopt the proposed rate was not wrong.

■ Furthermore, with respect to the imposed revenue cap, the Commission faced what it considered to be a "dilemma" due its inability to adopt any of the ridership estimates proposed by the petitioners. If it overestimated the ridership and a lower rate was adopted, Hi–Speed would experience what the Commission called a "revenue shortfall," and would therefore be unable to meet its revenue requirement or earn a reasonable rate of return. On the other hand, the Commission reasoned that if ridership was underestimated, there would be the potential of excess earnings. The Commission's solution was to establish a revenue cap mechanism designed to permit Hi–Speed to obtain one season's actual operating data in order to determine future rates, while at the same time furthering the Commission's mission to protect the ratepayers from excess earnings. We conclude that in light of this problematic situation, the Commission was not wrong

in setting the revenue cap in order to protect ratepayers from Hi–Speed's investors earning excessive profits.

## V

### Evidence

Lastly, we consider the petitioner Interstate's contention that the Commission erred by excluding expert testimony that Hi–Speed's proposed $26 rate would result in unfair and destructive competition. We disagree, and note that the *Division* had previously considered numerous factors in its evaluation of Hi–Speed's application, including the price differential issue as well as the issue of whether there was a necessity for Hi–Speed's proposed service. The scope of the *Commission's* investigation into Hi–Speed's rates involved only the propriety of the rates filed by Hi–Speed; the issue concerning the impact of the price differential upon Interstate was outside that scope. For these reasons, we are satisfied that the Commission did not err in excluding evidence of unfair and destructive competition in its investigation of Hi–Speed's rate filing.

For the foregoing reasons, the petition for certiorari is denied and the writ heretofore issued is quashed, and the March 31, 1999, order of the Commission is affirmed. The papers in this case may be remanded to the Commission with our decision endorsed thereon.