**In re NARRAGANSETT BAY COMMISSION GENERAL RATE FILING.**

No. 2001–518–M.P.

Supreme Court of Rhode Island.

Nov. 1, 2002.

Peter J. McGinn, Providence, for Plaintiff.

Paul J. Roberti, Providence, John Spirito/Steven Frias/Kendra L. Beaver/Leo J. Wold, Cranston, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

WILLIAMS, Chief Justice.

In this petition for certiorari, the Narragansett Bay Commission (NBC) asks us to determine whether the Public Utilities

Commission (commission) properly ordered the NBC to retain and compensate an independent auditor to oversee the administration of its multimillion-dollar combined sewer overflow abatement project (CSO project). The commission, acting on the recommendation of the Attorney General, found that an independent auditor would serve the public interest by monitoring the CSO project to ensure that it remain within budget. The NBC is concerned that if appointed, an independent auditor would improperly infringe on its managerial discretion. Because we conclude that the commission's order was made within the scope of its statutory authority and that it is clear that the independent auditor must not invade the prerogative of the NBC to manage the CSO project, we affirm.

## I

### Facts and Travel

Because of the limited capacity of some municipalities' sewer systems, approximately two billion gallons of wastewater and storm water discharges into Rhode Island's urban rivers and upper Narragansett Bay each year. The untreated sewage has a widespread negative impact on the environment. Congress's Clean Water Act of 1972 required the NBC to eliminate or mitigate seventy combined sewer overflows in its service areas. *See* 33 U.S.C. § 1251; *see also* G.L.1956 § 46–15.6–2 (setting forth the importance of clean water to Rhode Island citizens). To comply with the federal mandate, the NBC instituted a capital improvement program which included the CSO project. The construction of the three-phase CSO project is expected to take twenty-two years to complete. The cost of the project is staggering—the original cost estimate in 1995 for phase I was $165 million dollars. It is expected that today's cost estimate of $227 million will similarly be exceeded. It is believed that the CSO project will be the largest and most costly construction project ever undertaken by the state.

In June 2000, the NBC filed an application with the commission requesting permission to increase the utility rates charged to its customers primarily to maintain financing for the CSO project. The NBC proposed a 34 percent rate increase to be apportioned to each customer based on the customer's water consumption. The NBC filed testimony and exhibits to support its application. In response, the Rhode Island Division of Public Utilities and Carriers (division), which "serve[s] the commission in bringing to it all relevant evidence, facts, and arguments that will lead the commission in its quasi-judicial capacity to reach a just result," submitted its own testimony. *Providence Water Supply Board v. Public Utilities Commission*, 708 A.2d 537, 539 (R.I.1998) (quoting *Providence Gas Co. v. Burke*, 419 A.2d 263, 270 (R.I.1980)).

To provide an opportunity for public comment, hearings were held to discuss the application. The division and the NBC then began negotiating a settlement agreement (agreement) to present to the commission for its approval. During negotiations, Assistant Attorney General Paul Roberti (Roberti) from the Department of the Attorney General (department), initiated a discussion with NBC and division representatives about incorporating a provision for hiring an independent auditor to oversee the CSO project. Because both the division and the NBC were unwilling to adopt the proposal, the department filed a motion to intervene on behalf of the public. *See* G.L.1956 § 39–1–20; *In re Island Hi–Speed Ferry, LLC*, 746 A.2d 1240, 1245 (R.I.2000). The commission granted the motion.

In November 2000, the agreement was presented to the commission for its approval. The commission held public evidentiary hearings on the agreement. During these hearings Roberti elaborated on the department's position advocating for "some independent audit" of the CSO project. Roberti asked the commission to consider a position "to ensure that the costs that will arise from [the CSO] project are as low as possible." Roberti explained that the auditor's function would not be to "second guess" the engineering or design issues of the CSO project, but instead would be to monitor its costs and report to the commission.

The division opposed the appointment of an auditor. Stephen Scialabba (Scialabba), the division's chief accountant, pointed out that the NBC already had a management services contract with The Louis Berger Group, Inc. (Berger) to oversee the project. In addition, Berger had hired Gilbane Company and Jacobs Associates (Gilbane), to manage the project's construction. Furthermore, Scialabba believed that various members of the division staff fulfilled the duties of an overseer. The NBC agreed and presented Joseph Pratt (Pratt), vice president of Berger and the CSO project program manager, to explain the overseer functions already in place. Moreover, Pratt discussed the nuances of the competitive bidding process to which the NBC already was bound under state law to counter Roberti's proposal that the auditor could review bids. Lastly, Pratt discussed the proactive nature of the Disputes Review Board (DRB) members who visit the construction site to ensure harmony and correct foreseeable problems to avoid time-consuming arbitration.

The parties then filed post-hearing memoranda elaborating on the independent auditor proposal. The department outlined several specific tasks that an independent overseer could address including (1) ensure fairness and reasonableness of CSO project budget targets, (2) perform appropriate investigative field work and document review, (3) attend critical project meetings, (4) when problems arise ensure that proposed solutions are cost-effective, (5) provide commission with updates and (6) evaluate costs of the second and third phases of the CSO project. In January 2001, the commission held a final hearing to further explore the independent oversight proposal.

The department presented two additional witnesses to support its recommendation. Attorney Michael McElroy (McElroy) testified that the independent overseer would be valuable to the commission because Berger representatives lacked independence as employees of a for-profit corporation. McElroy opined that the independence of the auditor would instill public confidence in the CSO project. Stephen Garfinkel (Garfinkel) testified in more detail about how an auditor could examine the structure of the accounting system for the CSO project. The NBC again presented Pratt who reiterated his opinion that an independent auditor would do tasks already being done by Berger, Gilbane, the NBC and the DRB. The division maintained that it could do some of the work proposed by the department at no additional cost to the ratepayers.

On October 25, 2001, the commission issued a report and order adopting the department's recommendation to hire an independent auditor. The commission, relying upon G.L.1956 §§ 39–1–19 and 39–1–26(b), required the NBC to hire and finance an independent auditor. In so doing, the commission "[p]resūm[ed], [it] * * * need only show that the retainment of an expert or consultant will assist [it] in

performing its regulatory duties and that the retainment of such an expert or consultant is in the public interest." The commission found that the independent auditor would not usurp Berger's current managerial function because the independent auditor would not "be vested with decision making or management authority over the CSO project," but rather it would "advise the [c]ommission as to its progress and any problems therewith." The independent overseer also would be charged with the duty to "provide a review of the internal controls," "monitor the bidding process," including "inform[ing] the [c]omission as to which bids NBC has selected and the reasons why NBC selected those particular bids." To finance the auditor position, the NBC was ordered to withhold $150,000 from its operating reserve. The NBC filed a petition for writ of certiorari asking this Court to review the commission's order.

## II

### Standard of Review

■■■ Under G.L.1956 § 39–5–1, any person aggrieved by a decision of the commission is entitled to petition this Court for a writ of certiorari "to review the legality and reasonableness of the decision or order." Upon review,

"[t]he findings of the commission on questions of fact shall be held to be prima facie true, and as found by the commission and the supreme court, shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the commission made in the exercise of administrative discretion shall not be reversed unless the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably." Section 39–5–3.

We have consistently stated that "[t]he role of factfinder in utilities cases is that of the commission alone, and our review is limited to whether the decision of the commission was fairly and substantially supported by legal evidence specific enough to enable us to ascertain if the facts upon which the commission's decision is premised afford a reasonable basis for the result reached." *Energy Council of Rhode Island v. Public Utilities Commission,* 773 A.2d 853, 860–61 (R.I.2001) (quoting *Newport Electric Corp. v. Public Utilities Commission,* 624 A.2d 1098, 1101 (R.I. 1993)). Only if this Court finds that the commission acted illegally, arbitrarily or unreasonably, may we "reverse * * * the judgments and orders of the commission and * * * remand a cause to it with such mandates as law or equity shall require; and the commission shall enter judgment or order in accordance with the mandates." Section 39–5–4. Furthermore, we review the commission's statutory interpretations *de novo.* See *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates,* 763 A.2d 1005, 1007 (R.I. 2001) (citing *City of East Providence v. Public Utilities Commission,* 566 A.2d 1305, 1307 (R.I.1989)).

## III

### Independent Auditor Requirement

■■■ The General Assembly has given the commission broad authority to supervise and regulate public utilities. See *In re Island Hi–Speed Ferry,* 746 A.2d at 1244 (citing *Town of East Greenwich v. O'Neil,* 617 A.2d 104 (R.I.1992)). Specifically, § 39–1–1(c) "vests the [c]ommission with the 'exclusive power and authority to supervise, regulate, and make orders governing the conduct of companies offering [energy, communication, and transportation services] to the public' for the purpose of protecting the public against improper and unreasonable rates." *In re Hi–Speed Ferry,* 746 A.2d at 1244 (quoting § 39–1–

1(c)). The commission also possesses the " 'jurisdiction, powers, and dut[y] * * * to hold investigations and hearings involving the rates, tariffs, tolls, and charges' of a public utility." *Id.* (quoting § 39–1–3(a)).

In this case, the commission determined that it could order the NBC to retain an independent auditor pursuant to § 39–1–19(a). Section 39–1–19(a) provides in pertinent part that:

"To carry out the purposes of this title, the commission * * * within the appropriation therefor, are authorized to employ such clerks, stenographers, engineers, accountants, and agents as may be required * * * and may also retain and employ experts, consultants, and assistants on a contract or other basis for rendering legal, financial, professional, technical or other assistance or advice."

The plain language of § 39–1–19(a) reveals that the commission possesses the authority to make an appointment. However, the NBC argues that this authority is not unfettered.

■■■ First, the NBC argues that even if the commission has the authority to order it to hire an auditor, there is a lack of substantial evidence to demonstrate a need for the position. " '[W]hen the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings.' " *Cummings v. Shorey*, 761 A.2d 680, 684 (R.I.2000). A plain reading of § 39–1–19 reveals no limitation on the commission's authority to hire an overseer. Even if the commission was required to demonstrate a need for the position, there is sufficient testimony in the record below to establish that a need exists. For example, the cost of the CSO project alone provides ample justification for additional safeguards to be implemented to protect the ratepayers. *See* § 39–1–1(d)(1) (declaring

lower utility rates to be in the public interest). Various witnesses before the commission referred to the Central Artery Project in Boston, also known as the "Big Dig," as an example of a construction project mired in the problems that all the parties are seeking to avoid in the CSO project.

The NBC also argues that an overseer is unnecessary because he or she would be duplicating work already done by Berger and the division. However, at the hearings on the agreement and at oral argument it was clear that the division did not have an employee solely dedicated to overseeing the CSO project. In fact, at the close of the commission hearings, a division representative said that it would seek funding from the General Assembly to hire an additional full-time employee (FTE) to act as overseer. At oral argument it was apparent that the General Assembly has not yet approved funding for any additional FTE to assist the division. Furthermore, the commission found that the role of the auditor would not be duplicative because the auditor would report directly to the commission. We take these factual findings as *prima facie* true and reject the NBC's argument. *See Providence Water Supply Board,* 708 A.2d at 541 (citing § 39–5–3).

■■ The NBC next argues that an independent overseer will engage in managerial functions that are reserved to the NBC and Berger. The NBC anticipates that the overseer will act as a supervisor rather than a consultant.

■■ We have stated consistently that "the broad regulatory powers of the [commission] ordinarily do not include the authority to dictate managerial policy." *Providence Water Supply Board,* 708 A.2d at 543 (citing *Blackstone Valley Electric Co. v. Public Utilities Commission,* 543

A.2d 253, 255 (R.I.1988)). Instead, "[i]t is the function of the [commission] to regulate a utility in order to determine that its rates are fair and reasonable. It is not the function of the [commission] to manage the utility or to exercise the prerogatives of ownership." *Id.* (quoting *Blackstone Valley Electric Co.,* 543 A.2d at 255). At oral argument and in its brief, the commission has said that the overseer would not have a managerial function. Without this assurance we certainly would not condone the commission's position because an independent auditor has no authority to interfere with the division, the NBC or Berger in the administration of the CSO project.

In addition, since an independent overseer has not yet been appointed there can be no evidence that he or she has acted to disturb or usurp the NBC's managerial prerogatives. If such an invasion materializes, the NBC is not without a remedy. In that case the NBC must seek its remedy with the commission. *See* § 39–1–1(c).

■ Finally, the NBC argues that the commission did not have the authority to require it to draw on its operating reserves to finance the auditor position. The commission found that typically the NBC's operating reserve was 1 percent of its revenues. In the agreement, the NBC sought to increase the reserve to 1.5 percent, or $541,363. The commission then required the NBC to set aside $150,000 of the $541,363 to finance the auditor position.

Under § 39–1–26(b), as amended by P.L.1996, ch. 316, § 1 "[t]he total amount which may be charged to any public utility under the authority of this section * * * in any calendar year shall not exceed one hundred sixty thousand dollars ($160,000)." The NBC argues that by requiring it to set

aside $150,000 to retain the auditor, the commission has breached § 39–1–26(b). We find this argument wholly without merit. There is no evidence that the commission exceeded its authority by requiring the NBC to finance the auditor position.

### Conclusion

The NBC has failed to demonstrate that the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably when it ordered the retention and funding of an independent auditor. The independent auditor must not invade the prerogative of the NBC to manage the CSO project. Accordingly, for the reasons stated herein, the NBC's petition for certiorari is hereby denied. The writ previously issued is quashed. The order of the commission requiring the NBC to retain and finance an independent auditor is affirmed. The papers in the case may be returned to the commission with our opinion duly endorsed thereon.