**In re ISLAND HI–SPEED FERRY, LLC.**

Nos. 2002–512–M.P., 2002–513–M.P.

Supreme Court of Rhode Island.

June 23, 2004.

Michael R. McElroy, Esq., Providence, (for Interstate), Merlyn P. O'Keefe, Esq. (for Town), Peace Dale, for Plaintiff.

Mark Jay Hagopian, Esq., Providence, (for Hi–Speed), Steven Frias, Esq. (for PUC), for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SUTTELL, JJ.

## OPINION

WILLIAMS, Chief Justice.

This case is before the Court on separate statutory petitions for certiorari filed by Interstate Navigation Company d/b/a The Block Island Ferry (Interstate), and the Town of New Shoreham (town) (collectively petitioners). After granting certiorari, this Court consolidated the matters for briefing and argument. The petitioners seek review of an August 20, 2002,

report and order (2002 order) of the Public Utilities Commission (PUC or commission) issued in docket number 2802, in which it ruled that Island Hi–Speed Ferry, LLC (Hi–Speed) could . continue operating through the 2002 season charging a previously approved rate. In re High–Speed Ferry's Request for Confidential Treatment of Compliance Report and Data Responses, docket no. 2802, (written order issued August 20, 2002). Also in the 2002 order, the PUC denied the petitioners access to a compliance report and related data responses (compliance report) Hi–Speed submitted as part of its obligation to provide information to allow the PUC to monitor the reasonableness of Hi–Speed's rates. *Id.* Because the 2002 operating season has passed and the PUC has since issued a new order establishing Hi–Speed's rates, In re Island Hi–Speed Form of Regulation and Review Rates, docket no. 3495, (written order issued November 25, 2003), the issues raised in this case are moot. Therefore, we affirm the 2002 order of the PUC.

# I

## Facts and Travel

Interstate and Hi–Speed are competing companies that provide ferry services to and from the town.[1] Because Interstate has been in business since at least 1954, Hi–Speed may be viewed as the new kid on the block. In 1998, the PUC granted Hi–Speed permission to operate a high speed catamaran shuttling passengers between the town and the Port of Galilee in Narragansett. In a report and order issued on March 31, 1999 (1999 order), the PUC approved round-trip rates of $26 for adults and $12 for children[2] for Hi–Speed applicable for the 1999 season—May 14 through October 11. In authorizing Hi–Speed's temporary rates, the PUC ordered Hi–Speed to file a "Cost of Service Schedule and Rate Design"[3] so the PUC could revisit Hi–Speed's rates after its initial test year. The 1999 season, however, came and went without Hi–Speed beginning its operation. Nevertheless, in 2000 this Court was called upon to review Hi–Speed's 1999 rates. *In re Island Hi–Speed Ferry, LLC,* 746 A.2d 1240 (R.I. 2000). Despite the fact that the rates under review at that time technically applied only to the 1999 season, which had concluded, we held that the case was not moot because the "administrative gridlock" that had delayed the commencement of Hi–Speed's service was likely to recur and evade judicial review. *Id.* at 1243. We treated the 1999 rate approval as though it applied "for the initial season during which

1. New Shoreham is an island town in the State of Rhode Island.

2. The PUC also authorized a $14 one-way adult rate and one-way child rate of $8.

3. The PUC required Hi–Speed to submit information relating to:
   "[t]he actual cost of service schedule (income and expense statement) for the initial year of operations; [a] calculation of the earned return on equity for the year 1999; [a] schedule showing the actual capitalization of [Hi–Speed] at the start of operations (May 1999) and at the close of operations (October 1999); [a] pro forma cost of service schedule for the year 2000; and [t]he calculation of rates for the year 2000 based on the pro forma of service and ridership estimates for the year 2000."

Hi–Speed also was required to submit information about the total number of tickets sold and a breakdown between adult and child round-trip and one-way sales; the number of days Hi–Speed did not provide service and the reasons why; monthly revenues for all sources of income; the status of Hi–Speed's vessel leases for 1999 and 2000; and the status of Hi–Speed's attempts to procure "a vessel for subsequent years through long-term lease, purchase, etc."

Hi–Speed is in operation" and ultimately ruled that the methodology used to calculate the rates was reasonable. *Id.* at 1243, 1246–47. Thus, when Hi–Speed finally launched its maiden voyage in mid-summer 2001, it operated under the rate approval that originally applied to the 1999 season.

On January 15, 2002, Hi–Speed filed a compliance report (report) in accordance with the PUC's 1999 order. When it submitted its report, Hi–Speed asked the PUC to treat the report as confidential[4] pursuant to Rule 1.2(g) of the Public Utilities Commission Rules of Practice and Procedure.[5] The petitioners objected to Hi–Speed's request for confidential treatment of the report, and Interstate requested access to it pursuant to the Access to Public Records Act (APRA), G.L.1956 chapter 2 of title 38. The town also argued that no rate had been set for Hi–Speed's 2002 operating season because the previous rate approval applied only for the 2001 season and had expired. The town further asserted that it had a right to participate in any hearings about Hi–Speed's 2002 rates.

After a public hearing, the PUC granted confidential and proprietary treatment to Hi–Speed's report on a preliminary basis. In its post-hearing brief, Hi–Speed maintained that the PUC was not required to conduct a rate case to set its 2002 tariffs. It argued that the PUC should exercise its discretion and allow the 2001 rates to remain in effect so new rates could be based on data available after the 2002 season— Hi-Speed's first full season of operation. Interstate filed a post-hearing brief, in which it argued that the approved 2001 rates could not be used by Hi–Speed in 2002 and that it would be illegal to authorize new rates without a public hearing. Also in the wake of the hearing, Interstate filed an objection to a PUC data request for information about whether Interstate planned to enter the high-speed ferry market. Interstate said the information requested "is proprietary and confidential and is protected from disclosure because to disclose it would cause substantial harm to the competitive position of Interstate."

In the 2002 order, the PUC announced that it made a final determination that the report that Hi–Speed submitted was pro-

---

4. Hi–Speed technically requested the Public Utilities Commission to enter a protective order limiting disclosure of the compliance report. The PUC, however, treated Hi–Speed's request as a request for confidential treatment pursuant to Rule 1.2(g) of the Public Utilities Commission Rules of Practice and Procedure.

5. Rule 1.2(g) of the Public Utilities Commission Rules of Practice and Procedure provides in pertinent part:

 *"Public Information.*

 (1) Access to public records shall be granted in accordance with the Access to Public Records Act, R.I.G.L. § 38–2–1 et seq. Except where the Commission directs otherwise, all pleadings, orders, communications, exhibits and other documents shall become matters of public record as of the day and time of their filing. Any claim of

privilege shall be governed by the policy underlying the Access to Public Records Act, with the burden of proof resting on the party claiming the privilege.

 (2) Any party submitting documents to the Commission may request a preliminary finding that some or all of the information is exempt from the mandatory public disclosure requirements of the Access to Public Records Act. A preliminary finding that some documents are privileged shall not preclude the Commission's release of those documents pursuant to a public request in accordance with R.I.G.L. § 38–2–1 et seq.

 \* \* \*

 (5) Any person, whether or not a party, may apply to the Commission for release of the information, pursuant to the Access to Public Records Act."

prietary and confidential.[6] Describing the information in the report as a "roadmap" for starting a competing high-speed ferry service, the PUC specifically found that "the financial information developed in establishing [a high-speed ferry] business is proprietary and to disclose it to a potential competitor would likely cause substantial harm to [Hi–Speed]." It also noted that Interstate is the incumbent ferry carrier and, with the information contained in the report, could use its superior financial resources and name recognition to enter the high-speed ferry business and undercut Hi–Speed. In fact, based on Interstate's refusal to answer its questions about whether Interstate planned to enter the high-speed ferry business, the PUC found that "Interstate would be likely to use the information contained in [the report] in a manner that would cause substantial harm to Hi–Speed's competitive position." Accordingly, the PUC overruled the petitioners' objections to Hi–Speed's request for confidential treatment and denied Interstate's APRA request.

The PUC also allowed Hi–Speed to continue charging rates in accordance with the terms of the order applicable to the previous year. So ordering, the PUC said that until "such time as Hi–Speed actually files for a rate change or has at least a full year of financial and operating data available, [it would] exercise its discretion in opening a new docket with regard to setting new rates, if appropriate, for Hi–Speed." The PUC opined that

> "[t]o conduct a rate proceeding at this time based on only a few months of data, and then conduct another rate proceeding for Hi–Speed at the end of this year after a full year's data is collected, would

be an inefficient use of time and resources on the part of the [PUC]. Also, allowing a full year's worth of data to be collected in order to set new rates, if appropriate, is consistent with the [PUC's] prior orders in this docket and will not harm the ratepayers."

This Court granted certiorari to review the 2002 order in September 2002. Thereafter, on February 27, 2003, the PUC initiated a new docket to review the reasonableness of Hi–Speed's rates and charges. In November 2003, the PUC issued the 2003 order in the new docket (3495) denying Interstate's and the town's requests to intervene. Ultimately, the PUC determined that the appropriate form of rate regulation for Hi–Speed is a price floor with no revenue or profit cap, and that the appropriate charges were the amounts Hi–Speed charged in its initial season. The PUC also authorized Hi–Speed to retain any revenue collected in excess of the previously determined revenue cap.

■■■ We are of the opinion that the opening of a new docket by the PUC and reestablishing Hi–Speed's rates has rendered all issues in this case moot. "This Court has held that 'a case is moot if * * * events occurring after [its] filing have deprived the litigant of a continuing stake in the controversy.'" *Morey v. Wall,* 849 A.2d 621, 624 (R.I.2004) (quoting *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence,* 754 A.2d 89, 90 (R.I.2000) (per curiam)). "The mootness doctrine ensures that the litigant's interest in the outcome continues to exist throughout the appellate process." *Id.* "A case that otherwise is moot may be considered if the issues involved are likely

---

6. The PUC, however, found that portions of the report that Hi–Speed voluntarily disclosed were not subject to the protective order.

to recur in such a way as to evade review and are of great public importance." *Id.*

▇▇▇▇ When asked at oral argument about their attempts to gain access to Hi–Speed's report, petitioners said that their ability to gain access to the report was crucial to a proper determination of Hi–Speed's rates for the 2002 season. Because the 2002 season has passed, however, any changes to the rates for that season would constitute retroactive ratemaking by the PUC. "One of the central principles of ratemaking is that rates must be prospective." *Providence Gas Co. v. Burke,* 475 A.2d 193, 197 (R.I. 1984). Subject to narrow exceptions, the PUC is prohibited from engaging in retroactive ratemaking. This Court has sanctioned retroactive rate increases to allow a utility to recoup extraordinary expenses incurred as a result of an unusually severe storm, *Narragansett Electric Co. v. Burke,* 415 A.2d 177, 179 (R.I. 1980), or an unforeseeable "*supplemental* tax surcharge assessed by [a] city," *Providence Gas Co.,* 475 A.2d at 198. Here, however, no parties argue that Hi–Speed's rates should be increased retroactively to make up for extraordinary expenses similar to those incurred in *Narragansett Electric Co.* and *Providence Gas Co.* Also, a retroactive rate reduction would be impracticable given the nature of the ferry industry. Unlike utility companies that provide services to account-holding customers, Hi–Speed's patrons are unidentified passengers who would not benefit from a refund. *Cf. Mountain States Telephone and Telegraph Co. v. Arizona Corporation Commission,* 124 Ariz. 433, 604 P.2d 1144, 1146–48 (Ct.App. 1979) (ordering a phone company to refund unlawfully established charges); *State v. Conservation Council of North Carolina,* 312 N.C. 59, 320 S.E.2d 679, 686 (1984) (ordering a power company to refund "proceeds of rates that were illegally charged"). Therefore, based on petitioners' avowed purpose in seeking access to the compliance report, the PUC's APRA and Rule 1.2(g) rulings are moot.

The most important fact that renders this case moot, however, is the fact that the PUC has issued a new report and order setting Hi–Speed's rates after a public hearing. The 2003 order authorized Hi–Speed to set its rates based on a price floor that equaled the 2002 tariffs. That order also authorized Hi–Speed to keep any money that may have exceeded the previously determined revenue cap. Because Hi–Speed currently is operating under the 2003 order rather than the 2002 order,[7] for which petitioners seek review in this case, petitioners could not obtain legal redress regardless of our ruling on the

7. The 2002 order has no force and effect. In the nine page 2003 order (3495), the PUC specifically ordered:

"1. That the appropriate form of regulation for [Hi–Speed] is to set its rates based on a price floor with no revenue or profit cap imposed.
2. That the appropriate price floor is the current passenger rates that were originally based on [Hi–Speed's] business plan filed in Docket No. 2802.
3. That bicycle rates shall be set at the discretion of [Hi–Speed].
4. That if [Hi–Speed] has collected in excess of the previously determined revenue cap, it may retain those funds.
5. That. [Hi–Speed] shall comply with all other direction of the [PUC] as contained herein."
It is clear that the 2003 order is comprehensive and completely supersedes the 2002 order. The fact that the rates have remained constant is not relevant to the issues before the Court. If anything, the consistency of the rates suggests that they are reasonable. There is no indication that the 2003 rates

propriety of Hi–Speed's 2002 operating tariffs.[8]

Even if this case were not moot, we would question whether the PUC's decision to continue a tariff triggers the hearing requirement of G.L.1956 § 39–3–11. Section 39–3–11(a) provides "[w]henever the commission receives notice of any *change or changes* proposed to be made in any schedule filed under the provisions of § 39–3–10, the commission shall hold a public hearing and make investigation as to the propriety of the proposed *change or changes.*" (Emphases added.) Here, the PUC continued its order setting Hi–Speed's tariffs without changing its terms. Notably, the Supreme Court of Alabama has held that the continuation of an expired rate does not constitute a rate change and does not trigger procedures necessary to effectuate a rate change. *Airco, Inc. v. Alabama Public Service Commission,* 496 So.2d 21, 23–24 (Ala. 1986). Also, with respect to the petitioners' assertion that the PUC was required to conduct a hearing as part of its obligation to periodically review Hi–Speed's rates, there is no indication that the PUC

unreasonably shirked that duty. In fact, the PUC specifically explained in the 2002 order that it would not be prudent to review Hi–Speed's rates because of the lack of data to perform a proper evaluation. Nevertheless, because we deem the PUC's rulings in the 2002 order to be moot, we need not reach the other issues that the petitioners raise.

### Conclusion

For the reasons stated herein, we affirm the report and order of the Public Utilities Commission. The record shall be remanded to the Public Utilities Commission with our decision endorsed thereon.

Justice FLAHERTY did not attend oral argument but participated on the basis of the briefs.

FLANDERS, Justice, dissenting.

I respectfully disagree with the majority's conclusion that this petition is moot. Merely by issuing a new rate-setting order in 2003 for Island Hi–Speed Ferry (Hi–Speed)—one that continued in effect Hi–Speed's challenged rates for the previous 2002 season [9]—the Public Utilities Com-

---

were set arbitrarily. Rather, the 2003 order indicates that the PUC set the new rates after carefully reviewing the operating data it originally ordered.

8. The town sought certiorari to review the 2003 order in Supreme Court case No.2003–214–M.P.

9. The commission issued this new order in docket number 3495 on November 25, 2003. In that order, the commission determined that the appropriate form of rate regulation for Hi–Speed was a price floor with no revenue or profit cap. But it set the price floor at Hi–Speed's current passenger rate based on the business plan it filed in late 1998 in docket number 2802. The commission also decided that Hi–Speed could set its own bicycle rates and that it could retain any money col-

lected in excess of the previously determined revenue cap.

Previously, in docket number 2802, the commission regulated Hi–Speed by fixing a specific rate accompanied by a revenue cap. In that docket, the commission issued the 2002 order, which is the subject of the present statutory petition for certiorari. The 2002 rate order continued the rates originally set in the commission's 1999 rate order. Thus, from the 1999 order to the 2003 order, the commission has changed only the form of regulation from a revenue cap to a price-floor model. The rates themselves, however, have remained constant. Although Hi–Speed may now raise its rates under the price-floor form of regulation, as a practical matter, its rates have not changed since the commission's original rate order.

mission (commission) did not moot the issues that Interstate Navigation Company (Interstate) and the Town of New Shoreham (town) have raised with us in this statutory certiorari petition.

The petition asks us to review the propriety of a 2002 commission rate order pertaining to Interstate's competitor, Hi-Speed, one that merely continued Hi-Speed's previous rate in effect for the remainder of the 2002 season. I would hold that the issues raised in this petition present a live, justiciable controversy because the 2002 rate order in question continues to have a present effect on the current rate that Hi-Speed charges for its services. Moreover, even if the commission subsequently had entered an entirely new rate order—instead of continuing the previous rate in effect—Interstate still holds a legally cognizable interest in the outcome of the previous rate-setting proceeding that is the subject of its present petition because that order, it alleged, adversely affected its financial performance while it was in effect.

In similar cases, other courts have rejected mootness arguments based upon the mere fact that a regulatory authority has entered a new rate order before the appellate court could review the challenged rate order. For example, in *Potomac Electric Power Co. v. Public Service Commission,* 402 A.2d 14, 22–23 (D.C.1979), the court rejected a mootness argument even though the Public Service Commission (PSC) had entered a later rate order superseding the previous rate order that was the subject of the appeal. In that case, the PSC issued an initial rate order from which the affected power company appealed. *Id.* at 16. At or about that same time, the power company applied for a second rate increase. *Id.* at 21. By the time the appellate court heard the power company's appeal from the initial rate order, the PSC

had issued a second rate order that superseded the first one. *Id.* Nevertheless, even though the second order was final, the appeals court cautioned that "[t]he question * * * of mootness is not so clear." *Id.* at 22.

Although the court in *Potomac Electric Power Co.,* 402 A.2d at 23 ultimately found in favor of the PSC, it rejected the PSC's motion to dismiss the appeal as moot. It concluded that the power company held a continuing stake in resolving whether the PSC properly conducted the previous rate proceeding. *Id.* at 22–23. According to the court, the PSC's "arbitrary decision" in the previous rate proceeding entitled the power company to "seek[] an opportunity to be made whole for the revenues it claim[ed] it lost during the period this [first rate] order was effective." *Id.* at 22. In addition, the appeals court suggested that it might remedy an arbitrary act of the PSC by allowing the power company to impose a surcharge on its present customers. *Id.* at 22–23. The court, therefore, refused to dismiss the appeal as moot and held that the later rate order—even though it was final and superseded the previous rate order—did not inexorably moot an appeal taken from a prior rate proceeding, as long as the appealing party held a continuing economic stake in establishing the impropriety of the first order. *See id.* Cf. *State ex rel. Intercon Gas, Inc. v. Public Service Commission of Missouri,* 848 S.W.2d 593, 596 (Mo.Ct.App.1993) ("The fact that an act authorized by PSC has been completed pending appeal does not itself render an appeal moot.").

By a parity of reasoning, this Court should not deem issues arising from the commission's rate-setting orders to be moot simply because the commission has opened a new rate proceeding and entered a new rate order concerning the same party while an appellate challenge to that

previous rate order is pending. Instead, we should reject a mootness claim when, as here, the challenged order under appellate review not only continues to affect the current rate order but also, as a practical matter, when it continues to function as *the* current rate order. That previous rate order, (that is, the August 20, 2002 order), which itself merely extended Hi–Speed's previous rate, still affects—indeed, constitutes—the present rate order, thereby effectively keeping Hi–Speed's challenged rate in force yet again.

It goes without saying that this Court does "not address moot, abstract, academic, or hypothetical" issues, *Morris v. D'Amario,* 416 A.2d 137, 139 (R.I.1980), but only those cases that present a live, justiciable controversy. *Sullivan v. Chaffee,* 703 A.2d 748, 752 (R.I.1997). Thus, we have "consistently held that a case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *In re New England Gas Co.,* 842 A.2d 545, 553 (R.I.2004) (quoting *Cicilline v. Almond,* 809 A.2d 1101, 1105 (R.I.2002) (per curiam)). A case is moot, therefore, when a party no longer "has a legally cognizable interest in the outcome of [the] litigation," *Malinou v. Powers,* 114 R.I. 399, 403, 333 A.2d 420, 422 (1975), and a judgment, if rendered, would have no practical legal effect upon the existing controversy. *E.g., Junkins v. Branstad,* 421 N.W.2d 130, 133 (Iowa 1988).

But the general rule in public-utility rate-setting cases, such as this one, is that issues concerning the propriety of a rate order do not become moot merely by the opening of a new rate proceeding or even by the entry of one or more subsequent rate orders—especially when, as here, a later order is not final because of a pending appellate proceeding challenging the

legality of that order. *Gas Service Co. v. State Corporation Commission,* 6 Kan. App.2d 592, 631 P.2d 263, 265 (1981). *See also Connecticut Natural Gas Corp. v. Public Utilities Control Authority,* 183 Conn. 128, 439 A.2d 282, 285 (1981) ("A regulatory agency does not moot an appeal from a rate order by issuing a more recent order."). If the previous rate order can have any possible prospective effect, then even the entry of a later rate order does not moot the previous order, and arguments concerning the propriety of the order from the previous rate proceeding constitute a live, justiciable controversy. *See Gas Service Co.,* 631 P.2d at 265. Hence, a statutory certiorari petition challenging a previous rate order is not moot so long as the rate order from the previous proceeding may have "real, even if short-lived, effects." *Id.*

Here, the issues that Interstate raises about the propriety of the previous rate proceeding are not moot because even though the new rate "proceeding" has produced a new rate order, that order allowed Hi–Speed to continue the same rate in effect as the previous rate. In other words, the challenged rate order still has some prospective effect because it constitutes the very basis for the new rate order. *See Gas Service Co.,* 631 P.2d at 265 (holding that later rate orders do not moot issues raised in prior rate proceedings if the prior rate order can possibly have any prospective effect).

Moreover, the new order is not yet final, because it too is presently subject to a pending petition by the town before this Court. The town's statutory petition for certiorari challenging the commission's decision denying it intervenor status in the most recent rate proceeding is presently pending before this Court. Thus, the new rate will not become final for mootness purposes until the town exhausts its right

to have this Court review that later rate order. *See* G.L.1956 § 39–5–4 (vesting Supreme Court with discretion to suspend execution of commission order); *Narragansett Electric Co. v. Harsch*, 117 R.I. 940, 942, 367 A.2d 195, 197 (1976) (recognizing that this Court has power to stay order of commission).

Furthermore, in addition to the challenged 2002 order's continuing effect on the current 2003 rate, both Interstate and the town still hold a legally cognizable interest in obtaining a decision from this Court about whether the commission acted properly in issuing the previous rate order, one that it allegedly issued without holding a required public hearing and without allowing these intervenors effectively to participate in the rate-setting process. *See Potomac Electric Power Co.*, 402 A.2d at 22 (noting that "[t]he question * * * of mootness [was] not so clear" even though second rate order arguably superseded first). Presumably, this is why the commission found, in the first place, that Interstate and the town possessed sufficient standing to intervene and to participate as parties in the challenged proceeding.

Although standing and mootness are distinct concepts, they often overlap. *See* 1 Laurence H. Tribe, *American Constitutional Law* 345 (3d ed.2000); 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure:* § 3531.12 at 50 (2d ed.1984). Mootness is " 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).' " *United States Parole Commission v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). Here, Interstate has a continuing stake in the commission's rate-setting for Hi–Speed because it allegedly continues to suffer the adverse eco-nomic effects of the commission's decision to allow Hi–Speed to operate at the rate in question, a competitive interest that makes it an aggrieved party for standing purposes. The commission itself recognized this competitive interest when it allowed Interstate to intervene in the challenged rate-setting proceeding.

Under § 39–5–1, a party possesses standing to challenge an order of the commission that aggrieves that party. *See In re New England Gas Co.*, 842 A.2d at 553. In addition, regulated businesses, like Interstate, possess standing to challenge commission decisions that directly involve a competing regulated business, such as Hi–Speed. *See RAM Broadcasting of Colorado, Inc. v. Public Utilities Commission*, 702 P.2d 746, 749–50 (Colo.1985) (holding that a regulated paging company had standing to challenge the Public Utility Commission's grant of a competing paging company's application).

As a former monopolist of ferry service to Block Island, Interstate allegedly suffered a direct competitive injury from the rate proceeding in question. The order allowing Hi–Speed to continue operating at the previously approved rate directly injured Interstate's business by depriving it of revenues and profits that it otherwise would have realized but for the commission allowing its competitor to operate at the rate in question. *See id.* (reasoning that "additional competition" resulting from commission decision injured the regulated company sufficiently to give it standing to challenge competitor's application). This allegation of a direct economic injury confers standing on Interstate to challenge the previous rate-setting order. And Interstate allegedly continues to suffer the adverse economic effects of the commission allowing its competitor to operate at the rate set in the commission's previous rate order because the commission has

allowed that rate to remain in effect after its latest rate setting. Thus, Interstate holds a continuing stake in having this Court determine whether the commission acted arbitrarily or unlawfully when it approved the previous rate.[10]

In addition, this case is not moot because this Court could issue a decision that has a practical legal effect upon this controversy. *See Potomac Electric Power Co.,* 402 A.2d at 22–23 (refusing to dismiss on mootness grounds, in part, because court had the ability to award equitable relief to the power company). If, for example, we were to reach the merits of Interstate's arguments and decide that the commission had issued a rate order without conducting the required public hearings or that it did so without providing the intervenors or their counsel with sufficient access to the documents on which the commission based its rate-setting order, we could vacate the previous order and direct the commission to hold a new hearing on that rate-setting request.

Indeed, this Court could authorize the commission to require Hi–Speed to impose a surcharge on, or provide a rebate to, its current customers, if that were necessary to counter the effects of an improper rate-setting order. Although the commission is generally barred from retroactive rate-making, this rule is subject to exceptions that may be applicable in this case. *E.g., Narragansett Electric Co. v. Burke,* 505 A.2d 1147, 1148, 1149 (R.I.1986) ("The rule against retroactive ratemaking will not preclude the granting of refunds in situations * * * wherein a utility earns well in excess of its authorized rate of return."). We have recognized one such exception when the commission issues "a rate schedule which represents a deprivation of due process either in its inability to provide a fair return or in the grossly excessive time it took to correct good faith errors of the commission in arriving at the new rates * * *." *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 116 R.I. 356, 392, 358 A.2d 1, 22 (1976). *Accord Bristol County Water Co. v. Harsch,* 120 R.I. 223, 231, 386 A.2d 1103, 1108 (1978) (recognizing exception); *Narragansett Electric Co. v. Burke,* 119 R.I. 559, 569, 381 A.2d 1358, 1363 (1977) (same). Such a conclusion "would certainly entitle the company to some sort of extraordinary relief." *New England Telephone & Telegraph Co.,* 116 R.I. at 392, 358 A.2d at 22.

---

10. Likewise, I would also hold that the new rate proceeding did not moot the issue of whether the Town of New Shoreham (town) possessed a statutory right under G.L.1956 § 39–3–11(b) to participate effectively in the previous rate-setting proceeding. Under G.L. 1956 § 39–5–1, a municipality has standing to seek appellate review of a commission decision that allegedly has aggrieved the municipality's residents. *See City of East Providence v. Public Utilities Commission,* 566 A.2d 1305, 1307 (R.I.1989) (holding that City of East Providence had standing to challenge decision of commission because it was the appropriate party to represent the interests of the residents who were allegedly injured by that decision). *See also Londonderry Neighborhood Coalition,* 145 N.H. 201, 761 A.2d 426, 428 (2000) (holding that neighborhood coalition had standing to challenge administrative agency decision). Here, the town's residents were aggrieved because the commission arguably violated their rights by failing to provide the town with meaningful participation as a party in the challenged rate-setting proceeding, as required under § 39–3–11(b). *Cf. Leone v. Town of New Shoreham,* 534 A.2d 871, 874 (R.I.1987) ("The foundation of due process rests on an opportunity to be heard in a meaningful manner at a meaningful time."). Because the town and its residents allegedly continue to suffer the effects of the way in which the commission set the previous rate, they have a continuing stake in our determining whether the commission violated § 39–3–11(b) when it issued the previous rate-setting order.

In addition, the general rule against retroactive ratemaking is not strictly applied when a court is attempting to remedy a utility commission's previous procedural mistakes. *See* Stefan H. Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings,* 1991 U. Ill. L.Rev. 983, 1002 (1991) ("Although a rigid interpretation of the rule against retroactive ratemaking would also prohibit any modification by the commission of a prior rate order that affects past utility gains or losses, courts have allowed such changes in situations in which the commission is remedying procedural mistakes."). For example, in *Mike Little Gas Co. v. Public Service Commission,* 574 S.W.2d 926, 927 (Ky.Ct.App.1978), the court rejected the argument that a later order improperly raised rates. Instead, the commission entered the new order *nunc pro tunc* to correct a clerical error in the previous order. *Id. Cf. Building Owners & Managers Association of Metropolitan Detroit v. Public Service Commission,* 424 Mich. 494, 383 N.W.2d 72, 81 (1986) ("A challenge to a rate based on a procedural flaw does not render its subsequent validation a retroactive rate.").

Here, I would hold that this Court has the ability, for example, to order the commission to enter a new order *nunc pro tunc* that would charge a different rate to Hi–Speed's current customers if that were necessary to remedy the commission's alleged procedural errors when it set the challenged rate. If we were to decide that the previous rate order unlawfully deprived Interstate of revenues it otherwise might have realized, we could order the commission to enter a new order *nunc pro tunc* that would impose a surcharge or provide a rebate to Hi–Speed's current customers. However unlikely such potential remedies might be in this case, it is nevertheless the possibility, not the probability, of our granting such relief that is relevant in a mootness inquiry.

Thus, because this Court has the authority under certain circumstances to remedy the continuing injurious effects, if any, of the previous rate order, this case is not academic and presents a live, justiciable controversy. Accordingly, I do not agree that this appeal is moot.

Finally, if this Court deems the challenged rate order to be moot, what is to stop the commission and Hi–Speed from continuing to moot present and future attempts by Interstate and the town to have us review the commission's present and future rate-setting orders for Hi–Speed by the simple expedient of opening a new rate-setting proceeding for every new season and continuing the previous rate order in effect? Thus, before this Court could review any petition challenging the propriety of this most curious method of setting a rate, the town's petitions for review challenging that new order would be moot. I do not believe that, by declaring this petition to be moot, we should leave this Court so wide open as to be "gamed" in this fashion.

Based on the foregoing, I would hold that the commission's mere opening of a new rate proceeding and its issuance of a new rate order for Hi–Speed that continued Hi–Speed's previous rate in effect did not moot the issues that Interstate and the town have raised in this statutory petition for review. Therefore, I would proceed to decide the petition on its merits.